John Russell WEBSTER, et al., Plaintiffs-Appellees Cross-Appellants,

v.

The CITY OF HOUSTON, Defendant-Appellant Cross-Appellee.

No. 81–2007.

United States Court of Appeals, Fifth Circuit.

Oct. 28, 1982.

**1221**

James K. Gardner, Timothy James, Houston, Tex., for defendant-appellant cross-appellee.

Harvill & Hardy, G. P. Hardy, III, Alison Pettiette, Houston, Tex., K. Michael Mayes, Conroe, Tex., for plaintiffs-appellees cross-appellants.

Before BROWN, GOLDBERG and TATE, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Television police dramas paint a frightening and often bloody picture of life. The suffering of innocent victims and their families nightly invades our living rooms, subject only to the viewer's freedom to change the channel. In this case we lack that freedom, for this episode involves a true story. The names have not been changed; and in the final scene, the innocent, far from being protected, lay on a city street, dying, while Houston police officers debated whether to cover up their misdeeds by placing a "throw down" gun at the victim's side. We find that the evidence supports the jury's verdict in favor of the victim's parents in this § 1983 claim against the City of Houston but, since the jury misunderstood its instructions, we remand for a new trial as to damages alone.

Randy Webster, a 17-year old native of Shreveport, Louisiana, stole a van from a Dodge dealership on the Gulf Freeway in Houston, Texas. Houston police officer Danny Mays spotted the van and gave chase. Officers Holloway and Olin, responding to his radioed calls, joined in. A Houston taxi driver, trying to do his part, tried to force the van off the road. Eventually, near the intersection of Telephone Road and Hall Road in southeast Houston, Randy lost control of his vehicle. It spun out of control and came to rest facing the direction he had come. The police cars screeched to a halt nearby. Mays, Holloway and Olin ran up to the van and ordered Randy out.

At this point, the testimony diverges. According to the initial police report, Randy got out of the car with something in his hand. He resisted the officers' attempt to place him under arrest; a struggle ensued; and, as Officer Mays attempted to subdue him, his gun misfired, fatally wounding Randy in the head.

Ten minutes later, the story had changed. The officers related that Randy emerged, armed, from the van and was shot immediately. Whichever story one prefers, when the ambulance arrived, a gun rested in Randy's hand.

The truth, which came to light after a long, and, for Randy's parents, agonizing nightmare of involvement with the Houston Police Department (HPD), is not pleasant. The taxi driver who had given chase, standing near his cab, and a local resident both saw the events. They presented a different story. Dolan, the taxi driver, testified as follows:

A: After the van spun around and came to a stop the driver had his hands up like this, you know, just about head level and he was trying to come out of the van at this time. . . .

Q: Did you at any time see Randy put up any resistance to what was going on there?

A: No, sir. I did not.

Q: And before the gun was fired do you say Randy was somehow brought to the ground? . . .

A: He started screaming after they had him on the ground because they were pulling his hair. . . . He said, "O.K., man. O.K. All right. I have had enough." And that's about all he said before he was shot. . . . And I had told [police] that I had saw everything, and even when the boy was laying there, there was no weapon beside him. There was no weapon in his hand when they pulled him over, because I was there.

William G. List, who lived nearby, confirmed this account.

I saw the boy get out of the van with his hands not clear up, but approximately, you know, raised to the point that you see them raised.... He still had to duck his head to get of the van and he still had his hands in the air, so they weren't, you know.... He got out.... The boy got out, the police officer blocked my view by standing in front of him or being in front of him, but the boy, you could still see, was bigger than the police officer. So he either kicked him or hit him or whatever, I don't know, but the boy went to the ground. And a few seconds later I heard gunshot go off.... This all happened within seconds. There was no time for any fighting or struggling, you know.

Officer Olin, under questioning by counsel, verified this account.

Q: Mr. Olin, at the time Randy was shot in the back of the head, he was pretty much pinned to the ground, wasn't he?

A: Yes, yes.

Q: He wasn't a threat to you or Mr. Mays, was he?

A: I can't speak for Mays. I didn't recall him to be a threat to myself.

Q: He wasn't armed, was he?

A: No....

Q: He was pinned on the ground at the time he was shot, wasn't he?

A: Yes.

Q: He had his hands behind his head, didn't he?

A: I don't recall where his hands were.

Q: He wasn't offering any resistance, was he?

A: Not to me....

Q: Mr. Olin, whatever happened that night, there is no doubt in your mind that the force that was being used by you and Mr. Mays was excessive, correct?

A: Correct.

Knocked to the ground by the officers, Randy gave no resistance and was shot within seconds. He had no weapon, a 17-year old boy against several police officers.

Tragedy did not deter the officers from considering practicalities. What to do about the "mess"? According to Officer Holloway, "Tommy [Olin] was standing there talking ... and Byrd walked up to me and asked if we needed a throw down.... I said, 'I don't know.' That would be up to Danny Mays and Tommy Olin. It was their shooting and it is their mess."

A "throw down", the starring role in this tragedy, is a weapon which police officers, having killed (or wounded) an unarmed suspect, can put at his side to justify the shooting. How common. was this practice? The officers, testifying at trial, made clear that a throw down was "common knowledge". Officer Holloway: "I had several officers tell me that if I needed a throw down that they had one or knew where they could get one." He continued, "I know that maybe the Department and the City and the news media were trying to say that we were the first ones that admitted this throw down, but that has been a part of police work long before I came on the streets." Officer Dillon concurred. "It would be brought up like when [instructors at the Police Academy] would be sitting at various crime scenes for instruction, it would be casually mentioned that if you ever shot anyone accidentally, well, you had best have something to lay down to protect yourself." Officer Byrd, who provided the throw down, explained,

Q: How many officers or what percentage of officers either carried a throw down in 1977 or had access to a throw down?

A: I would say 75–80% of them.

Q: Was that common knowledge on the force back in February of '77?

A: Yes.

Q: It wasn't unusual at all at the Webster scene that there were two officers that had a throw down?

A: It wasn't unusual, no.

Q: Pretty much common practice?

A: Most of the officers either carried a knife or a gun.

Q: It was pretty much an accepted practice that there would be a throw down at any one given situation if needed?

A: Right. Not any set policy or anything like that, but it was just a situation just to cover yourself on an individual basis.

Indeed, as pointed out at oral argument, the mere fact that everyone understood the term "throw down" demonstrated its widespread use.

Why employ a throw down? As Holloway explained, "I had had nobody say anything definite about what was going on or anything and what was going to be done *to protect Mays....*" (emphasis added) Protection of an officer, then, was the name of the game. "I think that it was known that if you got in trouble a throw down could be obtained.... It is not like we would go around thinking about it all the time, it is just in the back of your mind." Holloway added: "I think that would be the same thought in any officer's mind ... to protect the officer from shooting somebody that was unarmed." Questioning from counsel developed this point:

Q: But the fact that you and your partner had discussed the burglar situation, it was at least in your minds that there may be an accidental killing and a throw down could be used?

A: Yes, sir.

That throw downs existed might be common knowledge, a fact of life at that time for Houston police officers, but did officers in fact use them? Officer Dillon replied in the affirmative:

Q: So there is at least one other case two years prior to Randy's situation where a throw down weapon was used as far as you know?

A: Yes, sir.

And Officer Byrd conceded, "It was just common fact. It had happened before." As for his superiors, "They don't directly condone. They know it happens."

The Websters did not believe the official version of that night's events. Mr. John Webster, Randy's father, came to Houston to find out the truth. Met at every turn with evasion if not hostility, he became convinced that the Houston police were covering up. He was right.

The evidence as to cover-up, while circumstantial, is no less damning. Dolan, the taxi driver, went to police headquarters the morning after the shooting to give a statement. A Lieutenant Eickenhorst interviewed him and later advised Police Chief Bond to "disregard" Dolan's account. Although investigating officers took photographs of the scene, no one bothered to study them. Officers Marriott and Binford, assigned to the no doubt unpleasant task of investigating their fellow officers, interpreted their mission as one of vindication. They never studied the autopsy report, which plotted the path of the bullet and proved that Randy was on the ground when shot. Nor did they order trace metal tests, ballistic studies, or a trigger pull examination—routine parts of such an investigation. They did not interview any of the at least 20 Houston police officers or the Pearland, Texas officers who converged on the scene within minutes after the shooting. For example, Officers Garza and Koontz saw Randy's body beside the van. He had no gun. Officers Byrd, Dillon, Estes, Bloodworth and others—all uninvolved in the shooting—discussed the use of a throw down. They, too, knew Randy had had no gun. Yet despite the eyewitness report of taxi driver Dolan, the prodding by the Websters, and the undeniable fact that many officers —"probably more than ten", according to Holloway—knew there had been no gun in Randy's hand, these facts never came to light. The HPD at first looked the other way and then, as that view became unpleasant, actively sought to conceal the truth.

The Websters filed suit under 42 U.S.C. § 1983 against the City of Houston and six former HPD officers, seeking damages for the death of their son. The District Court entered judgment upon a jury verdict, awarding them substantial amounts from the individual officers and $2548.73 in actual damages and $200,000 in punitive damages from the City. Houston appeals.

## I.

Houston challenges the sufficiency of the evidence on the Websters' § 1983 claim. It argues that it did not maintain a "custom of depriving citizens of their constitutional right" to be free of excessive force in an arrest and that the police officers' actions did not amount to such excessive force.

We begin with some observations about § 1983. Originally enacted as § 1 of the Civil Rights Act of 1871, part of the post-Civil War civil rights legislation, § 1983 declares that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

The legislative history reveals that the Reconstruction Congress sought to protect constitutional rights and to wipe out Ku Klux Klan violence in the southern states. The debates in Congress occasioned much emotion and rhetorical skill. Waxing eloquent on the failure to protect individuals' constitutional rights, Representative Perry cried, "sheriffs, having eyes to see, see not; judges, having ears to hear, hear not.... In the presence of these gangs all the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection." Cong. Globe, 42d Cong., 1st Sess., 447 (1871) (remarks of Rep. Perry), quoted in Schnapper, Civil Rights Litigation After Monell, 79 Colum.L.Rev. 213 (1979). Representative Lowe confirmed this nightmare, stating, "while murder is stalking abroad in disguise, while whippings and lynchings and banishments have been visited on unoffending American citizens, the local administrations have been found inadequate or unwilling to apply the proper corrective." Globe, 374 (remarks of Rep. Lowe), quoted in Developments—Section

1983 and Federalism, 90 Harv.L.Rev. 1133 (1977). Warned Senator Sherman, sponsor of an amendment to the Act, "Let the people of property in the southern States understand that if they will not make the hue and cry and take the necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome." Globe, 761, quoted in Monell v. Department of Social Services, 436 U.S. 658, 667, 98 S.Ct. 2018, 2024, 56 L.Ed.2d 611, 621 (1978). To label the legislation remedial, then, is an understatement. Its proponents took drastic measures to combat widespread deprivations of rights and state-condoned violence.

The original bill contained four parts. Section 1, the predecessor of § 1983, provided the means for enforcing constitutional rights in federal court. Parts 2–4 aimed to suppress Klan violence, allowing the President to dispatch the militia where necessary and suspending the right to habeas corpus in enumerated circumstances. Globe App. 335–36, quoted in Monell, 436 U.S. at 666, 98 S.Ct. at 2023, 56 L.Ed.2d at 620. In short, the Act of 1871 gave a dose of strong medicine to treat Congress' diagnosis of a severe problem.

## II.

After the Reconstruction period ended, the Act "laid dormant as a result of restrictive judicial construction," Developments, supra, until the Supreme Court in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), opened wide the door to § 1983 liability. The Court held that state officers' acts that violate both the Constitution and state law give rise to a federal cause of action independent of any state remedies. While the Court did limit the right of recovery to individuals, relying upon the legislative history for its conclusion that Congress had not intended to make municipalities liable, the effect nonetheless was pronounced. As Justice Powell summed up, "few cases in the history of the Court have been cited more frequently than Monroe." Monell, 436 U.S. at 704, 98 S.Ct. at 2043, 56 L.Ed.2d at 644 (Powell, J., concurring).

Justice Frankfurter, dissenting in part in *Monroe,* predicted that the holding "makes the extreme limits of federal constitutional power a law to regulate the quotidian business of every traffic policeman, every registrar of elections, every city inspector or investigator, every clerk in every municipal licensing bureau in this country." 365 U.S. at 242, 81 S.Ct. at 513, 5 L.Ed.2d at 535 (Frankfurter, J., dissenting in part). With foretelling accuracy he discerned the path of § 1983 liability, a path that "open[ed] the floodgates by federalizing a vast range of state administrative and tort law." P. Bator, P. Mishkin, D. Shapiro, H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System, 1981 Supplement, at 234. *See also* McCormack, *Federalism and Section 1983,* 60 Va.L.Rev. 1 (1974).

The Supreme Court made a further contribution to that floodtide in *Adickes v. S. H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). There Justice Harlan, interpreting the "custom or usage" language of § 1983, intimated that proof of a state-enforced custom of segregating customers at public eating places, if it might have encouraged the store to refuse to serve a black patron, could ground § 1983 liability. Against the background of legislative history, he concluded, "we think it clear that a 'custom or usage, of [a] state,' for purposes of § 1983 must have the force of law by virtue of the persistent practices of state officials." 398 U.S. at 167, 90 S.Ct. at 1613, 26 L.Ed.2d at 159. "This interpretation of custom," he added, "recognizes that settled practices of state officials may, by imposing sanctions or withholding benefits, transform private predilections into compulsory rules of behavior no less than legislative pronouncements." 398 U.S. at 168, 90 S.Ct. at 1614, 26 L.Ed.2d at 160.

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court throttled back on § 1983 liability. Black citizens of Philadelphia, Pennsylvania brought suit under § 1983 against the Mayor and other officials, charging that misconduct and specific incidents of police brutality violated their constitutional rights. While upholding the District Court's factual findings as to these incidents, the Court concluded that "there was no affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy by petitioners—express or otherwise—showing their authorization or approval of such misconduct." 423 U.S. at 371, 96 S.Ct. at 604, 46 L.Ed.2d at 569. Citing *Hague v. C.I.O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), Justice Rehnquist held, in effect, that acts of police misconduct, without more, did not state a good § 1983 claim against the city.

In *Monell, supra,* the Supreme Court upset the § 1983 applecart, holding that *Monroe* had misread the legislative history and that Congress *had* intended to include local governments among the "persons" to whom § 1983 applied. "[L]ocal governments, like every other Section 1983 'person' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." 436 U.S. at 690–91, 98 S.Ct. at 2036, 56 L.Ed.2d at 635. While a court could not impose such liability under a theory of respondeat superior, Justice Brennan surmised that "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury ... the government as an entity is responsible under § 1983." 436 U.S. at 694, 98 S.Ct. at 2037, 56 L.Ed.2d at 638. He added, "indeed, municipalities simply cannot 'arrange their affairs' on an assumption that they can violate constitutional rights indefinitely...." 436 U.S. at 700, 98 S.Ct. at 2040, 56 L.Ed.2d at 641.

### III.

While the Courts of Appeals deal on a daily basis with § 1983 claims, the scope of liability is so broad that we search in vain for a dispositive answer to the question before us: does the evidence as to throw downs establish a "policy or custom," *Monell, supra,* for § 1983 purposes?

In *Turpin v. Mailet,* 619 F.2d 196 (2d Cir.), *cert. denied sub nom. Turpin v. West Haven,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), the Second Circuit, while finding the evidence insufficient to support a § 1983 claim, delivered itself of some tactical dicta as to the reach of § 1983 liability. *Monell,* the Court held, did not require a written policy authorizing unconstitutional action.

We must therefore reject at the outset appellant's suggestion that an 'official policy' within the meaning of *Monell* cannot be inferred from informal acts or omissions of supervisory municipal officials. Indeed, by holding that a municipality can be held liable for its 'custom' *Monell* recognized that less than formal municipal conduct can in some instances give rise to municipal liability under § 1983.

619 F.2d at 200.

In *Owens v. Haas,* 601 F.2d 1242 (2d Cir. 1979), *cert. denied sub nom. County of Nassau v. Owens,* 444 U.S. 980, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979), a federal prisoner brought suit against Nassau County, New York and corrections officers under § 1983 for a severe beating from prison officials. The Second Circuit acknowledged that *Rizzo, supra,* would bar a § 1983 action where the county merely failed to supervise its employees but held that Nassau County "could be liable if the failure to supervise or the lack of a proper training program was so severe as to reach the level of 'gross negligence' or 'deliberate indifference' to the deprivation of the plaintiff's constitutional rights." 601 F.2d at 1246. "The brutal and premeditated nature of the beating in this case," the Court declared, "and the number and rank of officers involved warrant the allowance of limited discovery so that the plaintiff may attempt to substantiate a claim of 'deliberate indifference' by the county to the violence of prison officials." *Id.* Judge Smith concluded, "while some causal link must be made between the city's failure to train and the violation of constitutional rights, a single brutal incident such as this may be sufficient to suggest that link." *Id.*

We recently have considered the extent of a city's § 1983 liability. *Berry v. McLemore,* 670 F.2d 30 (5th Cir. 1982) (collecting cases), involved a § 1983 claim against a Mississippi police chief who, overreacting to an alleged traffic offender's protestations of innocence, beat him and shot him through the stomach, arm and neck. The town declined to take disciplinary action against the chief. Despite the appalling nature of McLemore's deeds, Chief Judge Clark upheld the town's immunity under § 1983, since no evidence revealed a municipal policy authorizing or encouraging excessive use of force. "Such an isolated instance of police misconduct does not indicate the kind of systematic, municipally-supported abuse to which *Monell* makes reference." 670 F.2d at 32. While gross negligence on the part of the city might create a § 1983 claim, *see, e.g., Herrera v. Valentine,* 653 F.2d 1220, 1224 (8th Cir. 1981); *Owens, supra,* at 1246–47, the Court found that the town had not been grossly negligent in hiring, training, or disciplining McLemore. It reasoned that the post-shooting failure to discipline McLemore could not have encouraged him in his earlier unconstitutional actions.

These cases sketch in the outlines of a § 1983 claim but leave the details in a mist. *Monell* and *Adickes* obligate us to look beyond the formal, written procedures of the HPD. Informal actions, if they reflect a general policy, custom or pattern of official conduct which even tacitly encourages police officers to use excessive force, may well satisfy the amorphous standards of § 1983. "The frequency and pattern of the practice alleged to be a custom or usage must be sufficient to give rise to a reasonable inference that the public employer and its employees are aware that public employees engage in the practice and do so with impunity." Schnapper, *Civil Rights Litigation After Monell, supra,* at 229. "Custom, however, could seemingly embrace more subtle encouragement or toleration of constitutional declarations. . . . More generally, tacitly encouraging or tolerating repeated constitutional violations by one's subordi-

nates can accomplish the same end as affirmative commands." Note, *Municipal Liability Under Section 1983: The Meaning of "Policy or Custom"*, 79 Colum.L.Rev. 304, 306–07 (1979). As the leading commentators phrase it, *Monell* sets § 1983 liability "if high local officials overtly or covertly authorize or encourage constitutional violations by subordinate officials." Hart & Wechsler, 1981 Supp. at 240. *See also* Comment, *Section 1983 Municipal Liability and the Doctrine of Respondeat Superior*, 46 U.Chi.L.Rev. 935 (1979).

■ Given this background, and after having studied the entire trial transcript, we find that the record supports the jury's verdict. The testimony of the officers demonstrates that the use of a throw down weapon was well-nigh universal throughout the HPD. From their earliest days in the Police Academy, recruits surreptitiously learn to "protect themselves" by employing a throw down. Such protection may have influenced the officers, even if not intentionally, to use greater force than necessary or to resort to unnecessary force in borderline cases. In protecting themselves, the officers take away the innocent victim's constitutional right to be free of excessive force.

The fact that some 20 officers who gathered at the scene pondered the use of a throw down provides further support for the jury's finding. All those officers knew that Randy had been unarmed, yet none came forward to clear the air. The parties refer to the Joyvies case, in which, apparently, an officer employed a throw down weapon. That incident proves that this throw down was not a first-time occurrence. Yet despite the widespread knowledge as to the use of a throw down, the HPD had never told officers not to use a throw down weapon. Officers continued to employ this tactic for one reason: they knew they could get away with it. The jury could reasonably infer from the testimony that the HPD's covert approval of throw downs encouraged policemen in their illegal activities. Since, as seems clear, everyone in the Department—from new recruits to the most senior officers—knew about the use of throw downs and "looked the other way", the jury could reasonably infer a "policy or custom," *Monell, supra,* of illegal actions which encouraged the illegal use of excessive force by HPD officers.

The HPD's cover-up also supports the verdict. Lieutenant Eickenhorst, who interviewed the taxi driver Dolan, urged the Police Chief to ignore the testimony. Why? Eickenhorst could provide no reason for his actions consistent with a police officer's duty to look for and find the truth. The investigating officers who should have investigated all leads preferred to see no evil. Closing their eyes to facts which ought to have prompted a vigorous inquiry, they, too provided support—if after-the-fact—for the HPD's unconstitutional actions. Why did no one come forward? Why did the HPD ignore unavoidable facts? The deliberate decision to cover the unconstitutional actions instead of exposing them effectively encourages future unlawful acts. The jury could well conclude that this studied cover-up, this deliberate unwillingness to find the truth itself gave credence to the idea that a throw down was a tactic acceptable to the police hierarchy. In short, it was regrettably a living part of official policy at HPD.

We are sympathetic to the plight of policemen, public servants who do a dangerous and difficult job, often without the kind of support they deserve from the citizenry they protect. Yet we cannot allow an officer's concern for protecting his colleagues to override the citizen's constitutional rights. Randy Webster had violated the law, for which he could legitimately be punished. Yet no offense can justify the shooting of an unarmed 17-year old and the subsequent cover-up by a not insignificant segment of the HPD. In taking Randy's life, the officer violated his constitutional right to live, to be free of excessive force, to face the charges against him, and to defend himself on those charges. In tacitly condoning the use of throw downs and then in covering up this instance of a throw down, the HPD implicated itself in that constitutional violation.

## IV.

Having affirmed the jury's verdict, we now must take up the question of damages. *Monroe, supra,* held that a municipality is not a "person" for § 1983 purposes. The Court reaffirmed this interpretation on several occasions. In *Moor v. County of Alameda,* 411 U.S. 693, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973), it held that a county was not liable for damages under § 1983. In *Kenosha v. Bruno,* 412 U.S. 507, 93 S.Ct. 2222, 2223, 37 L.Ed.2d 109, (1973), it held that § 1983 did not authorize suit for equitable relief against municipalities. *Aldinger v. Howard,* 427 U.S. 1, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976), held that a party could not join a state law cause of action against a county with a § 1983 claim against county officials on a theory of pendent jurisdiction. *See generally* Hart & Wechsler, 1981 Supp. at 238–39.

In *Monell, supra,* the Supreme Court did an about-face. Partially overruling *Monroe,* Justice Brennan asserted that *Monroe* misread the legislative history and that Congress had intended to include local governments among the "persons" to whom § 1983 applied. "[L]ocal governments, like every other § 1983 'person', by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental 'custom'." 436 U.S. at 690–91, 98 S.Ct. at 2036, 56 L.Ed.2d at 635. Justice Brennan did concede that § 1983 did not extend as far as the law of master-servant in tort. "A municipality cannot be held liable under § 1983 on a respondeat superior theory.... [The] language cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." 436 U.S. at 691–92, 98 S.Ct. at 2036, 56 L.Ed.2d at 636. Where the unconstitutional action resulted from a custom, usage, or acts that, even though without official approval, might reflect a policy of the city, however, municipal liability would lie.

*Owen v. City of Independence, Missouri,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980), followed closely on *Monell's* heels.

The Court held that the good faith of municipal officials does not entitle a municipality to qualified immunity from § 1983 liability. Writing once again for the Court, Justice Brennan, relying upon the history of the times and legislative materials, asserted,

> Where the immunity claimed by the defendant was well established at common law at the time § 1983 was enacted, and where its rationale was compatible with the purposes of the Civil Rights Act, we have construed the statute to incorporate that immunity. But there is no tradition of immunity for municipal corporations, and neither history nor policy support a construction of § 1983 that would justify the qualified immunity accorded the City of Independence.

445 U.S. at 638, 100 S.Ct. at 1409, 63 L.Ed.2d at 685.

Last year, the Court at last faced the question whether § 1983 permits an award of punitive damages against a municipality. *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). The City of Newport, Rhode Island cancelled a license for a concert because the city council feared that rock music would draw large crowds who might become unruly. The concert promoter brought suit under § 1983, alleging that the city's actions violated his First Amendment rights. The jury awarded both compensatory and punitive damages against the city, which appealed. The Supreme Court squarely held that a municipality is immune from punitive damages in a § 1983 claim. Referring to historical materials, Justice Blackmun concluded that "by 1871 ... a municipality, like a private corporation, was to be treated as a natural person subject to suit for a wide range of tortious activity, but this understanding did not extend to the award of punitive or exemplary damages." 453 U.S. at 259, 101 S.Ct. at 2756, 69 L.Ed.2d at 627. "The courts," he pointed out,

> readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vin-

dictive damages appropriate as a punishment for the bad faith conduct of those same officials and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment, and the municipalities from undue physical constraints.

453 U.S. at 263, 101 S.Ct. at 2757, 69 L.Ed.2d at 629. While acknowledging that one could "imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights," 453 U.S. at 267 n.29, 101 S.Ct. at 2760 n.29, 69 L.Ed.2d at 632 n.29, Justice Blackman pointed out that "punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers." 453 U.S. at 267, 101 S.Ct. at 2760, 69 L.Ed.2d at 632.

■ The plight of Randy Webster, however reprehensible, however tragic, does not rise to the level of outrageous conduct to which Justice Blackmun referred. As we discussed, *supra,* the language of § 1983 and the Act of 1871 from which it derives were enacted in a time of frightening violence, to ensure the most basic constitutional rights of citizens in southern states. If the members of Congress who drafted that Act did not intend to establish a rule of punitive damages, we believe that it would take a far more serious violation than that we confront to ground punitive damages against Houston.

The Websters seek to distinguish *Fact Concerts,* which involved a deprivation of contract rights, from the present case. While the facts and nature of infringed constitutional rights involved do differ, the Supreme Court's opinion lends itself to but one interpretation. It dictates that while a municipality may be subject to compensatory damages for violation of constitutional rights, it does not have to shoulder the burden of punitive damages. Since the trial court instructed the jury that it could assess punitive damages, which it then did, we must reverse that portion of the verdict.

We cannot delete this portion of the verdict and affirm the rest, however, for upon examination of the instructions and the jury's answers we find that the jury either misunderstood or ignored the judge's instructions. The Court told the jury to consider the following elements of damage: (1) compensation for Randy's conscious pain, suffering and mental anguish; (2) compensation for deprivation of his constitutional rights; (3) compensation for the Websters for Randy's medical and funeral expenses; (4) compensation for their loss of companionship and society and for their mental anguish; and (5) punitive damages against the city.[1]

---

1.                VERDICT

1. Do you find from a preponderance of the evidence that any of the Defendants are liable for violating the constitutional rights of Randall Allen Webster?

Answer "we do" on the line next to the Defendant's name if you find that such Defendant is liable. Answer "we do not" on the line next to the Defendant's name if you find that such Defendant is not liable.

(a) D. H. Mays          *WE DO*

(b) N. W. Holloway       *WE DO NOT*

(c) J. T. Olin           *WE DO*

(d) The City of Houston  *WE DO*

2. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate John Russell Webster, as temporary administrator of the estate of Randall Allen Webster, for damages sustained by Randall Allen Webster as a result of the occurrence in question?
ANSWER: $  *NONE*

3. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate John Russell Webster and Billie Ruth Webster for their damages for Randall Allen Webster's funeral and medical expenses incurred as a result of the occurrence in question?

The jury awarded $2548.73 to compensate the Websters for funeral and medical expenses and $200,000 in punitive damages against the city. As to the amount of Randy's damages, the jury found "none" and made the same finding for his parents' loss of companionship and society and their mental anguish.

■ The jury, having found a violation of Randy's constitutional rights, could not ignore that finding in calculating damages. Violation of Randy's constitutional rights was, at a minimum, worth nominal damages. *See Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). The jury, in awarding no damages for this claim, committed irreparable error.

In *Lucas v. American Manufacturing Co.,* 630 F.2d 291 (5th Cir. 1980), a personal injury suit, the hurricane-conscious jury found the defendant liable for the plaintiff's damages but, ignoring the stipulation that expenses totaled $8502.30, returned a verdict for $3500. We reversed and remanded for a new trial. As Judge Kravitch pointed out, "once the jury found the defendant liable for plaintiff's injuries, plaintiff was entitled to compensation.... [T]he verdict, however, was less than half of Lucas' stipulated out-of-pocket losses and reflected no award for pain and suffering. We find no evidentiary basis for the jury's award of only $3500." 630 F.2d at 293.

In *Davis v. Becker & Associates, Inc.,* 608 F.2d 621 (5th Cir. 1979), cited in *Lucas, supra,* the jury found the defendant negligent but assessed "$0" for physical and/or mental pain and suffering. The Court reversed and remanded for a new trial on damages. As Judge (now Chief Judge) Godbold pointed out,

The jury having found that plaintiff was injured from the 1975 accident, the defendant was liable for the consequences thereof.... The fact of injury in December, 1975 and the nature of that injury having been established, there was no substantial evidence that related plaintiff's pain to the earlier injury to the same disc. Thus the interrogatory awarding '$0' damages for pain and suffering cannot be reconciled with [the] interrogatory ... finding that defendant negligently caused injury to plaintiff.

608 F.2d at 623.

We believe that the jury, in awarding punitive damages, thought it had covered all bases. It, of course, did not. Since it in effect disobeyed its instructions, we are obliged to remand to the District Court for a new trial as to damages alone.

We affirm the verdict as to § 1983 liability against the city, reverse the verdict as to punitive damages, and reverse and remand for a new trial on damages.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.

GOLDBERG, Circuit Judge, specially concurring:

It is with considerable grief that I write to specially concur in the result denying punitive damages against the City of Houston. I fully concur in the majority opinion on all other issues, but must specially concur on the issue of punitive damages be-

ANSWER: $ _2,548.73_

4. What sum of money, if any, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate John Russell Webster and Billie Ruth Webster for the loss of companionship and society of Randall Allen Webster and for their mental anguish suffered as a result of the death of Randall Allen Webster, all resulting from the occurrence in question?

ANSWER: $ _NONE_

5. What amount, if any, do you assess against the Defendants as punitive damages, considering each Defendant separately? You may consider an assessment of punitive damages against a Defendant only if you have answered Question Number 1 "We do" as to that Defendant and if you find that such Defendant acted maliciously, wantonly, or oppressively.

(a) D. H. Mays $ _1,000,000.00_

(b) N. W. Holloway $ _NONE_

(c) J. T. Olin $ _200,000.00_

(d) The City of Houston $ _200,000.00_

cause the majority suggests that *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), might allow punitive damages against a municipality in a section 1983 suit if the facts were particularly egregious. Would that it were so, for then I could, with clear *judicial* conscience, urge taxing the City of Houston with punitive damages. If there were any narrow gap around *Newport* for an egregious case, this one would slip through; I am aghast at the thought that any violation of constitutional rights more appalling, more threatening than the one that occurred here might actually exist. Sadly, I view *Newport* as presenting an impenetrable barrier to punitive damages. Would that it were not so, for now I must, with troubled *human* conscience, concur in this unfortunate result.

The majority quotes a portion of a footnote from *Newport* as admitting an exception for egregious cases:

> 29. It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. Nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

*Newport,* 101 S.Ct. at 2760 n.29. The majority states that "[t]he plight of Randy Webster, however reprehensible, however tragic, does not rise to the level of outrageous conduct to which Justice Blackmun referred . . . . [W]e believe that it would take a far more serious violation than that we confront to ground punitive damages against Houston." Majority Opinion, *supra* at 1229. Among the multitude of legal standards of conduct, courts have re-

quired findings of malicious, wilfull, or intentional conduct before exacting punitive damages. If *Newport* had in fact created a new standard, "an outrageous abuse of constitutional rights," I would have no problem in holding *as a matter of law* that this case is such an outrageous abuse.

I believe the majority opinion has misinterpreted this footnote; rather than creating an exception, this footnote precludes any exception. It appears in a section of the opinion addressing a possible retribution justification for punitive damages. Justice Blackmun argues that retribution against the taxpayers would make no sense except in some rare case where the taxpayers were actually culpable,[1] and that did not seem likely enough to merit consideration.[2] The bottom line of the opinion admits of no exceptions: "[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983." 101 S.Ct. at 2762.[3]

The language of *Newport* is clear and absolute, and, accordingly, so is our duty in this case. If I merely disagreed with the Supreme Court's rationale in *Newport,* I would concur without further comment, and in fact, I agree with that rationale and the result in that case. However, after due deliberation and with great respect for the august institution above me, I am of the belief that the holding of *Newport* sweeps more broadly than its rationale would justify. Because of the gravity of the constitutional violation in the present case, I would be derelict in my duty if I did not express my views before acquiescing in this result.

I am in agreement with the Supreme Court in *Newport* not only in regard to rationale and result, but also in regard to the Court's overall approach to section 1983. What disturbs me is that the very method-

---

1. It might be possible to read footnote 29 as allowing an exception where the electorate of a political unit votes affirmatively in favor of outrageous conduct. Even in that situation there would be some difficulty in assessing damages where a minority of the electorate voted against the outrageous conduct.

2. "Damages awarded for *punitive* purposes, therefore are not sensibly assessed against the governmental entity itself." 101 S.Ct. at 2760

(emphasis in original). On the alternative deterrence rationale for punitive damages, the Court concluded that "the deterrence rationale of § 1983 does not justify making punitive damages available against municipalities." *Id.*

3. *Cf. Thomas v. City of New Orleans,* 687 F.2d 80, 84 n.2 (5th Cir. 1982) (dicta) (reading *Newport* as absolute bar to punitive damages against municipalities).

ology and rationale that dictate the result in *Newport* dictate a contrary result now. To illustrate this I shall follow the methodology of *Newport* and at each point indicate how the differences between *Newport* and the instant case, under the same form of analysis, lead to a different conclusion now. First I shall summarize the factual differences between the cases. Next, I shall cover the common law background and legislative history of section 1983. Finally, I shall discuss the policies underlying imposition of punitive damages.

## I. FACTS OF *NEWPORT* AND *WEBSTER V. CITY OF HOUSTON*

My interest in contrasting the facts of these cases is not solely to highlight the disparity in gravity of constitutional violations. Though that disparity tugs at the emotions, it is not a sufficient basis for protesting binding precedent. Rather, I want to establish the factual predicate for the arguments that follow. My goal is to show that the salient facts supporting the rationale in *Newport* are not present here; in fact, the opposite facts supporting an opposite result are present.

### A. State of Nature in the State of Texas: Webster v. City of Houston

Randy Webster, a seventeen-year-old, stole a van in the City of Houston. Three police officers, guardians of the peace, gave chase. At the conclusion of a high-speed chase, Randy lost control of the van and attempted to surrender to the police. He had his hands up and was trying to get out of the stolen van, unarmed, offering no resistance, when the police, to whom he wished to surrender, forced him to the ground and shot him in the back of the head. The police, rightly nervous about the consequences of killing an unarmed and unresisting teenager who was trying to surrender peaceably, planted a weapon near the corpse. The purpose of planting this "throw-down" gun was to add plausibility to their subsequent planned perjury—they did not shoot an unarmed, unresisting boy, no, they merely defended themselves against an armed and dangerous fleeing felon.

This crime, heinous as it is, is not what arouses my ire, nor is it the basis for municipal liability. What is outrageous, what makes the city liable, what is a perversion of public duty almost beyond belief is that the policemen acted in accordance with tacit Houston Police Department policy. The evidence showed that 75–80% of Houston policemen carried throw-down guns and that at least one incident like this had happened before. The heirarchy of the police department was aware of and indirectly condoned the practice. Most outrageous is that the practice was taught at the police academy, passed on as oral tradition from instructor to cadet.

A key point about this case is that Houston's tacit policy did not originate in any memo, it cannot be traced to the acts of any specific persons. Unlike the shooting, the "promulgation" of the policy of using throw-down guns does not involve any discrete actions by any discrete policeman, but rather the collective acts of omission of every policeman, every city official, every person who knew of the practice.

### B. Rock and Roll Will Never Die: City of Newport v. Fact Concerts, Inc.

Fact Concerts, Inc. ("Fact") had entered into a contract with the City of Newport to hold a jazz festival at a local concert site. The mayor and council became alarmed when they heard that Blood, Sweat and Tears would perform.[4] When Fact refused to remove Blood, Sweat and Tears from the bill, the city cancelled the contract on a pretext and announced the cancellation widely over the local media one day prior to the beginning of the concert. Fact obtained injunctive relief from a state court and the show went on. Unfortunately, due to the adverse publicity, ticket sales were off.

---

4. The mayor and council considered Blood, Sweat and Tears to be a rock group, and such music was thought conducive to poor audience behavior.

These were the facts on which the Supreme Court held that under no circumstances could punitive damages be assessed against a municipality.

### C. Compare and Contrast: Lost Sales v. Lost Lives

Though the general tenor of the two cases is manifestly different, it is useful to summarize the salient differences for the purpose of my subsequent legal analysis. In *Newport* the relevant activity was operating a concert site, a paradigmatic proprietary municipal activity; in this case the relevant activity is operating a police force, a paradigmatic governmental activity. In *Newport* the challenged activity was an ad hoc decision; here it is a widely followed municipal policy. In *Newport* there were specifically identifiable wrongdoers; here it is impossible to point to any person or persons responsible for the offending policy. In *Newport* the very nature of the wrong makes it public, whereas here the very nature of the wrong tends towards concealment. Finally, in *Newport* the consequence of the wrong was lost ticket sales; here it is needlessly, tragically, lost life.

With this factual background for *Newport* and our current case in mind, I now turn to an examination of the Supreme Court's inquiry into punitive damages against a municipality under section 1983. The Court's approach was two-phased. First, it investigated whether the legislative history, viewed in light of the then-existing common law background, allowed any finding of legislative intent to allow punitive damages against a municipality on those facts. It then examined the policies behind section 1983 to see if they would support punitive damages on those facts. I shall follow this two-phase approach, applying each phase first to *Newport,* then to our present case.

## II. LEGISLATIVE HISTORY OF SECTION 1983

The Court's underlying approach to the legislative history of section 1983 is in two parts. First, the Court presumes that Congress was well aware of the common law immunities that existed at the time, and that section 1983 embodies them unless there is some evidence of congressional intent otherwise. Second, because there is virtually no legislative history for section 1983 itself, the Court looks to the rejected Sherman Amendment to the Act to discern Congress' attitudes towards section 1983.

### A. General Background

Before applying the Court's legislative intent approach to the two cases, it is helpful to look at two broad points of historical background. First consider the general history of common law municipal immunities. Initially a general policy of immunity prevailed—no citizen could sue the sovereign save by leave of the sovereign, and a municipal corporation was an instrument of the sovereign and thereby immune from liability. As municipal corporations became more complex, this unitary view of immunity broke down. The justification for extending immunity to municipalities did not apply when municipalities acted like corporations rather than arms of the sovereign. Thus municipal liability was bifurcated depending on whether the municipal activity was of a governmental nature or a proprietary, commercial nature. When the municipality was acting in a governmental manner, it was totally immune from all liability. When the municipality was acting in a proprietary manner, it was immune from punitive damages but liable for compensatory damages.

The second historical background point is the context in which Congress enacted section 1983.

> The practice with which Congress was especially concerned was the systematic refusal of local law enforcement officials to enforce state criminal laws against members of the Ku Klux Klan and others who attacked blacks and Republicans. State law did not sanction or permit such discrimination, and in some cases the highest state officials were Republicans who opposed that discrimination, but the individual state employees who actually

had to carry out the administration of the criminal law pursued that practice nonetheless. As Representative Perry noted, "Sheriffs, having eyes to see, see not; judges, having ears to hear, hear not . . . . In the presence of these gangs all the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection." The Forty-second Congress regarded such a failure to enforce state laws as the quintessential violation of the equal protection clause. In some instances those state employees, especially sheriffs and deputies, actually joined in the criminal activities. The states themselves were criticized, not for actively supporting the violence or formally sanctioning the lack of law enforcement, but for "failing" or "neglecting" to curb this practice of non-enforcement by local judges and sheriffs. Schnapper, *Civil Rights Litigation After Monell,* 79 Colum.L.Rev. 213, 229 (1979) (footnotes omitted). Thus, the primary concern of section 1983 is lawless violence against defenseless citizens in violation of their constitutional rights, aided and abetted by the local authorities.

### B. Legislative History as Applied to Newport

In applying the two-part legislative history analysis in *Newport,* the Court first sketched the brief history of municipal immunities just presented, 101 S.Ct. at 2756 & n.19. Running a concert hall is clearly a proprietary activity, so the Court noted that the appropriate common law background was one of liability for compensatory damages, but immunity from punitive damages. 101 S.Ct. at 2756.

Given this common law background, the Court then looked for evidence of congressional intent to alter the common law scheme of municipal immunities. Because almost no legislative history on section 1983 itself exists, the Court examined the history of the Sherman Amendment on the theory that congressional attitudes towards issues in the Sherman Amendment suggest the likely congressional intent in section 1983.

The original intent of the Sherman Amendment was to make municipalities liable for losses caused by mob violence. 101 S.Ct. at 2758–59. During debate on this amendment, it was made clear that the liability extended only to compensatory damages, not to punitive damages. The amendment was rejected.

The *Newport* Court "doubt[ed] that a Congress having no intention of permitting punitive awards against municipalities in the explicit context of the Sherman Amendment would have meant to expose municipal bodies to such novel liability *sub silentio* under § 1 of the Act." 101 S.Ct. at 2759. The Court further pointed out that Congress rejected the Sherman Amendment in part because of the strain it would place on the municipal fisc and the unfairness of forcing innocent taxpayers to pay for the "deeds of persons over whom they had neither knowledge or control." *Id.* The Court saw "no reason to believe that Congress' opposition to punishing innocent taxpayers and bankrupting local governments would have been less applicable with regard to the novel specter of punitive damages against municipalities." *Id.*

### C. Legislative History as Applied to This Case

In this section I will apply the same two-part legislative history analysis of *Newport* to the facts of this case: first I will examine the common law scheme of immunities and then look for evidence of congressional intent to alter that scheme.

The questionable activity in this case involves running a police department, a clearly governmental function. As mentioned above, the common law scheme granted municipalities *total* immunity from liability for their governmental activities. The second part of the inquiry is whether Congress showed any intent to alter the common law scheme of immunities, and, if so, to what degree. As *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), so clearly points out, with section 1983 Congress intended to make municipalities liable for policies vio-

lating civil rights. Thus we have, in the case of governmental activities, a clear congressional intent to alter the existing scheme of common law immunities. Given that Congress intended to strip away at least *some* of the municipal common law immunities, the second step of the inquiry now becomes whether they intended to abolish *all* such immunities, in the context of municipal governmental activities.

As a preliminary point, because *Newport* establishes that Congress did not intend to abrogate immunity from punitive damages in a municipality's proprietary capacity, it might initially seem strange to believe that Congress would intend to allow liability for punitive damages in the traditionally more protected governmental capacity. This is not a strange thought, however, when considered in light of the core purposes of section 1983—prevention of governmental misconduct caused by aiding and abetting violence through failure to exercise the machineries of justice. Because section 1983 is closely tied to the prevention of official misconduct, it should be and is more sensitive to municipal dysfunction in the governmental area than it is to dysfunction in the proprietary area. For this reason, a policy under which policemen are permitted literally to get away with murder by perpetrating a fraud in a subsequent investigation is more offensive to the principles of section 1983 than is a municipal breach of a contract for a concert site that results in lost ticket sales. Accordingly, it is not at all hard to believe Congress might eliminate more immunities in the sensitive governmental sphere of activity.

In determining how much immunity Congress intended to abrogate, I need to examine how Congress thought imposing liability would assist eradicating the evils of governmental misconduct. Again, I follow the technique of *Newport* and examine the Sherman Amendment. Senator Sherman, speaking on behalf of his amendment, stated:

Let the people of property in the southern States understand that if they will not make the hue and cry and take the

necessary steps to put down lawless violence in those States their property will be holden responsible, and the effect will be most wholesome.

Cong. Globe, 42d Cong., 1st Sess. 761 (1871), *quoted in Monell,* 436 U.S. at 667, 98 S.Ct. at 2024. The Sherman Amendment, then, envisioned altering municipal behavior by placing liability on the citizens and relying on them to encourage alterations in behavior.

This Amendment, of course, was defeated. That defeat should not be construed as a rejection of this deterrent mechanism, however. The Amendment was rejected because of the novel *source* of liability, not because of the *fact* of liability or functioning of the deterrent mechanism. *See Monell,* 436 U.S. at 669–83, 98 S.Ct. at 2024–32. The Sherman Amendment was rejected because it imposed an affirmative duty on local governments to prevent violence by third parties. The portion of the Act containing what is now section 1983 raised no such problems, because it merely prevented local governments from violating the Constitution. "So long as federal courts were vindicating the Federal Constitution, they were providing the 'positive' government action required to protect federal constitutional rights and no question was raised of enlisting the States in 'positive' action." *Monell,* 436 U.S. at 680–81, 98 S.Ct. at 2030–31. So by imposing liability on municipalities in section 1983, Congress intended to deter future deprivations of constitutional rights by placing an economic burden on the taxpayers, who would cause the municipality to change its evil ways.

## III. PUBLIC POLICY IN SECTION 1983

### A. Policy, Proprietary Functions and Newport

The second half of the Court's two-phase section 1983 methodology is to investigate the policies behind section 1983 and see if those policies suggest any result. In *Newport,* the first phase of investigating legislative history showed that the common law scheme of immunities allowed compensatory damages but no punitive damages for

proprietary municipal activities, and the Court found no evidence of congressional intent to alter that scheme. The purpose of the second phase inquiry into policy, then, is to see if there are policy arguments strong enough to dictate a result counter to Congress' intent.

The Court considered two rationales for punitive damages and found that neither was harmonious with the policies of section 1983. The first potential rationale was retribution. The Court felt it made no sense to exact punitive damages from a municipality for retributive purposes because the actual economic burden would fall on the taxpayers, who were blameless. 101 S.Ct. at 2759–60.[5] This portion of *Newport* is valid under any facts and I have no quarrel at all with the Court's treatment of retribution.

The Court then considered whether punitive damages against a municipality would deter "the malicious conduct of their policy-making officials." 101 S.Ct. at 2760. First, the Court noted, punitive damages against the *municipality* probably would not deter wrongdoing *individuals*. Second, a deterrent effect is already present through existing sanctions, such as public reaction, reprimand from superiors, and so on. Third, damages levied directly against the offending officials serve as a more effective deterrent. Finally, the Court observed the potential for devastating financial liability for municipalities, resulting in "a serious risk to the financial integrity of these governmental entities." 101 S.Ct. at 2760–61. Given all this, the Court concluded that the deterrence rationale did not support punitive damages.

### B. The Core of Section 1983, Governmental Functions and Houston

The second phase inquiry in the present case has a different posture than it had in *Newport* because here the results of the first phase were different. The common law background was that municipalities were totally immune from damages for their governmental activities, and there was a definite congressional intent to alter that common law scheme. The legislative history of the Sherman Amendment shows that Congress' motivation for altering the common law scheme was to deter governmental deprivation of citizens' constitutional rights under color of state law. The second phase inquiry into policy now is to determine whether subjecting Houston to punitive damages in this case would promote Congress' deterrent goals.

### 1. The Arguments Against Punitive Damages in Newport Do Not Apply Here.

—The question of whether punitive damages would deter misconduct was considered in *Newport,* and there the Supreme Court found they would not help deter misconduct. The great factual differences between *Newport* and the case before me now, however, make *Newport*'s arguments against punitive damages inapplicable here. The primary factual difference making *Newport*'s arguments inapplicable is that *Newport* involved the wrongful acts of individual officials, whereas this case deals with a wrongful policy of concealing police murder, not traceable to any single individual, but rather the outgrowth of the collective inaction of the entire police department.

Thus, while the Court in *Newport* argued that punitive damages against the municipality would not deter *individual* misconduct, here we have *municipal* or *group* misconduct. Second, whereas in *Newport* the Court relied on sanctions from superiors as a sufficient deterrent, in this case the bad policy actually exists due to the collective inaction of the superiors. It seems strange to expect those same superiors to collectively sanction themselves for their continuing lassitude, and so *Newport*'s alternative sanction rationale does not apply. Third, in *Newport* the Court suggested that damages assessed directly against the offending official were a better deterrent. But while damages assessed directly against an individual might deter individual misconduct, at whom do we point the finger of guilt in

---

**5.** It was at this point the Court wrote footnote 29, which the majority read as allowing an exception. *See supra* at 1229. *But see supra,* p. 1231.

the case of tragic collective apathy? All the individual police officers who knew of the policy but did nothing? The instructors at the police academy who allowed this horrible technique to be inculcated at the very time adherence to law and the Constitution and fundamental human morality should have been taught? The police chief? The city council? The citizens snug in their beds, oblivious to the fact that young men were being shot down by their "protectors"? Finally, the Court in *Newport* argued that punitive damages for lost ticket sales might deprive the citizens of other services because of financial burdens from increased liability. But in this *core* section 1983 case, that is exactly what Congress wanted. It is necessary that the threatened damages cause some deprivation for the populace so that they will be nudged out of their blissful ignorance, "and the effect will be most wholesome." [6]

*2. Punitive Damages in This Case Would Promote the Policies of Section 1983.*—The factual differences between this case and *Newport* not only make *Newport's* arguments against punitive damages inapplicable, they also affirmatively suggest that in this case punitive damages would help deter the conduct section 1983 was designed to prevent. Before turning to the specific factual differences that support punitive damages, I must discuss generally the theories behind deterrence and damages. Though it is a little unsettling to talk about dry economics in a setting as emotional as this one, that is what Congress' deterrence rationale demands.

Under this economic view of damages, the key datum is that every action has social costs and social benefits. The correctness of a decision is judged by whether the social costs are less than the social benefits.[7] Problems arise, however, when the decisionmaker will receive the benefits but other parties bear the cost. In that case the decisionmaker will decide to follow the course bringing benefits, regardless whether that course is socially correct. The function of damages is to force the decisionmaker to consider the costs of his or her actions as well as the benefits and promote socially correct decisionmaking.[8] The point of damages, then, is to "internalize" costs to the decisionmaker.[9]

The choice between compensatory and punitive damages should be made based on whether one or the other will properly internalize the social costs and produce socially correct decisions. If all the parties bearing all the costs and enjoying all the benefits are before the court, then compensatory damages will properly account for all costs and benefits. For example, in the case of a city worried about violence at a music concert, the cost of cancelling the concert is the economic detriment to the promoter—lost ticket sales. The benefit of cancelling is potential avoidance of violence. If only compensatory damages are awarded, the city can make the correct decision. Compensatory damages force the city to internalize the cost of its decision, so it bears the loss rather than the promoter, and can make the right decision. Thus, in *Newport* the Court correctly denied punitive damages. All parties bearing all costs were before the court and only compensatory damages were proper.

---

6. The Court's fear of damages causing loss of services in *Newport* seems less pressing here. For one thing the category of cases that would merit punitive damages seems rather small. *See infra* III.B.2. For another, if the deterrent mechanism actually works, there will be few instances for assessing damages.

7. This form of analysis is agnostic as to the *distribution* of costs and benefits. Thus the Court's rhetorical argument in *Newport* that punitive damages would unjustifiably enrich an already fully compensated plaintiff is inapplicable here. *See, e.g.,* Coase, *The Problem of*

*Social Cost,* 3 J.L. & Econ. 1 (1960); Calabresi & Melamed, *Property Rules, Liability Rules and Inalienability: One View of the Cathedral,* 85 Harv.L.Rev. 1089 (1972).

8. The assumption of an economically rational decisionmaker, though often unjustified in the case of individuals, seems quite appropriate in the context of municipal policymaking.

9. *See, e.g.,* G. Calabresi, The Cost of Accidents, 68–129 (1970).

If, however, the situation is such that not all of the costs will come before the court, then compensatory damages will be inadequate to internalize the costs and punitive damages are needed. This is much more likely to happen when the relevant decision is one promulgating a policy, as in the present case, rather than one regarding a discrete event, as in *Newport.* The full costs of a policy might not come before the courts for several reasons.

The full costs of a policy might not be before a court because not all instances of the policy's application are known. For example, if a policy results in ten citizens suffering a cost of $10, but only one of those instances is discovered, compensatory damages would not internalize all the costs. If a court can tell that nine instances of application are likely to remain undiscovered, when one *does* come before it, the court should assess $90 punitive damages to internalize the costs of the undiscovered applications. But this illustrates precisely one of the differences between *Newport* and this case. The very nature of the wrong in *Newport* was public—it was broadcast widely over the local media. The very nature of the wrong here is one of concealment—only one case of use of throw-down guns has ever been before the court, and when 75–80% of the Houston police were carrying throw-down guns, it is hard to avoid the inference that some cases are not coming before the courts.[10]

Another instance in which punitive damages are needed to internalize social costs is if some social costs are known but are diffused widely through society. This point highlights the key difference between *Newport* and this case, the reason it would be an injustice to award punitive damages in *Newport* and a greater injustice not to award them here. In *Newport* the total social damages from the incident are summed up in the lost profits of the promoters and some minor dissatisfaction of those music lovers who would have bought

tickets but for the city council's actions. This case, however, produces social costs of the gravest nature. Without trivializing the most grevious injury done to the Webster family, it makes a travesty of the most fundamental values of our society to ignore the damage done to *them* by Houston's policy. The most primal reason for banding together in social groups is protection from violence. When members of the very institution created to protect us from violence instead inflict it, the social fabric is torn. This is but a tear, however, because we can all understand the possibility of uncontrollable renegades. But when the crime is concealed in accordance with the tacit policy of that institution, the social fabric is ripped into tattered rags.

It is only by threat of punitive damages that we can be sure policymakers will be cognizant of this grave social cost. It is only by threat of punitive damages that we can arouse policymakers from their dozing to eradicate policies such as this. If ever there were a need for punitive damages to encourage sound decisionmaking, this is it. It is time that the courts have a showdown with the "throw-down."

## CONCLUSION

In *Newport,* a case within the penumbra of section 1983, the Supreme Court rightly perceived that punitive damages were called for by neither the history nor policy of the statute. Sadly, I feel, the Court erred in issuing a holding exceeding the facts before it. Today I must live with the consequences of that holding and concur in the majority's denial of punitive damages, in obedience to the mandate from my superiors.

The majority opinion reads *Newport* as holding that in an outrageous case punitive damages may be assessed against a city. If *Newport* could be read that way, I would have no problem in finding as a matter of law that the tortious conduct of the city of Houston was outrageous in the extreme and

---

**10.** In fact, the record revealed that at least one other case had not been before the courts. *See*

Majority Opinion, *supra* at 1223.

would therefore affirm the case on the basis that the city is liable for punitive damages in an outrageous case. My difficulty and problem with the majority opinion is that I do not believe that *Newport* holds anything other than that there can *never* be an assessment of punitive damages against a city.

The very reason men and women come together in society is so that each person, through sacrifice of some individual freedom to the state, might better be able to pursue personal goals, protected by the state from violence by others. It is an outrage when agents of the state, rather than protecting the citizenry from violence, violate the right to life of a citizen. It is an unspeakable perversion, however, when the faceless minions of the state, the very ones charged with preventing and investigating murders, have a covert policy of concealing such a crime committed by one of their own, of perpetrating a fraud on any court that might investigate.

The role of the courts in society is a delicate one, that of a physician to the body politic. For a minor headache like *Newport* the aspirin of compensatory damages is a sufficient remedy. But the existence of a police policy of concealing police murder is a cancer in the vitals of society, not unlike the disease of the Klan in 1870's. Congress has prescribed deterrence and punitive damages are our sharpest scalpel. How can we be true to our oaths when denied the use of the tools of our trade? Who will cure us now?