Abraham Paul KOROTKI

v.

Thomas J. GOUGHAN, etc., et al.

Civ. No. K–79–1833.

United States District Court,
D. Maryland.

Sept. 28, 1984.

Michael E. Marr and Marr, Bennett & Carmody, Baltimore, Md., for plaintiff.

Howard G. Goldberg, Laurie R. Bortz and Smith, Somerville & Case, and James N. Phillips, Baltimore, Md., for defendants Goughan, Barton, Cartwright and Town of Fenwick Island.

FRANK A. KAUFMAN, Chief Judge.

Plaintiff Korotki, pursuant to 42 U.S.C. §§ 1983 and 1985 and state based law, instituted this case seeking damages and injunctive relief against eleven defendants who may be grouped as the "Maryland defendants," the "Delaware defendants,"

the "Fenwick Island defendants" and one defendant, "Sussex County, Delaware."[1] Subsequently, plaintiff entered into a Stipulation of Voluntary Dismissal of his claims against all of the Maryland and Delaware defendants[2] and a Stipulation of Dismissal with defendant, Sussex County, Delaware, of his claims against that defendant.[3] Accordingly, this case proceeded to trial only against the four Fenwick Island defendants who are the Town of Fenwick Island, Delaware ("Fenwick Island");[4] the Fenwick Island Police Chief, Cartwright; a Fenwick Island policeman, Goughan; and a Fenwick Island Alderman, Barton. In his complaint, plaintiff alleges that the Fenwick Island defendants subjected him to an unconstitutional arrest and to violations of his due process and equal protection rights and, *inter alia*, took such actions in violation of the Non-Resident Violator Compact[5] in order to raise revenues for the Town's treasury. Subject matter jurisdiction in connection with plaintiff's 1983 and 1985 claims is present pursuant to 28 U.S.C. § 1343.[6] Pendent jurisdiction exists over plaintiff's state law conspiracy claim because the latter arises from a "common nucleus of operative fact." *United Mine Workers v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). After a jury trial was held and the jury returned special verdicts under Federal Civil Rule 49(a), which verdicts were largely favorable to plaintiff and entitled plaintiff, under applicable principles of law, to

**1.** The Fenwick Island defendants are named in the body of this opinion *infra*. The Maryland defendants consist of former Secretary of the Department of Transportation of the State of Maryland, O'Donnell, former Administrator of the Motor Vehicle Administration of the State of Maryland, Bricker, and Hearing Officer Kenny of the said Motor Vehicle Administration. The Delaware defendants include Secretary of the Department of Public Safety of the State of Delaware, O'Rourke, Justice of the Peace, Orr, and Deputy Attorney General Burke, III.

**2.** Docket number 62, filed December 28, 1981, court file. In connection with that dismissal, plaintiff retained the right to seek attorneys fees against the Maryland and Delaware defendants for work performed by plaintiff's attorneys up to and including the date of the Stipulation of Dismissal. Plaintiff has, in the post-trial period, pursued such a claim.

**3.** Docket number 35, filed December 1, 1980, court file.

**4.** By Order dated September 6, 1983, the Town of Fenwick Island, Delaware, was substituted as a defendant for The Honorable Donald Hickman, President, Constituting the Town of Fenwick Island, State of Delaware. See docket numbers 77 and 79, court file.

**5.** The Non-Resident Violator Compact, a reciprocal agreement entered into between the States of Maryland and Delaware. 12 Md.Transp.Code Ann. §§ 403–413 and 21 Del.Code § 402.

The relevant provisions are set forth in Article III and provide:

(a) An officer making an arrest for a traffic violation shall issue a citation as appropriate to all motorists who are residents of the party jurisdictions and shall not, subject to the exceptions noted in paragraph (b) of this Article, require such motorists to post collateral or bond to secure appearance for trial, but may accept such motorists' personal recognizance that they will comply with the terms of such citation.

(b) No motorist shall be entitled to receive a citation under the terms of paragraph (a) of this Article nor shall any police officer issue such citation under the same terms in the event the offense for which the citation be issued shall be one of the following: (a) an offense for which the issuance of a citation in lieu of a hearing or the posting of collateral or bond is prohibited by law; or (b) an offense, the conviction of or the forfeiture of collateral for which requires the revocation of the motorist's license.

(c) Upon the failure of any non-resident to comply with the terms of a traffic citation, the arresting officer or other appropriate official may obtain a warrant for arrest and shall report said failure to the licensing authority of the jurisdiction in which the arrest was made. Such report shall clearly identify the person arrested; describe the violation, specifying the section of the traffic law, ordinance, rule or regulation violated; indicate the location of the offense; describe the vehicle involved and its registration number. Such report shall be signed by the arresting officer or other appropriate official.

**6.** Plaintiff, a Maryland citizen, is diverse from the Fenwick Island defendants, all of whom are Delaware citizens. However, diversity jurisdiction is absent because certain of the original defendants were not diverse. The existence of diversity jurisdiction "is determined by examining the citizenship of the parties at the time the action is commenced." 13 Wright and Miller Jurisdiction § 3608 at 653 (1975).

judgments herein against defendants Goughan, Cartwright and Town of Fenwick Island, defendants filed a number of post-trial motions. Plaintiff has also pursued in the post-trial period his quest for attorneys' fees pursuant to 42 U.S.C. § 1988.[7] The jury's answers to the special questions include awards of compensatory damages in the amount of $14,861.78 against each and all of the Fenwick Island defendants, punitive damages in the amount of $5,000 against each of the three individual defendants, and punitive damages in the amount of $100,000 against the defendant Town of Fenwick Island.

## I. FACTS

The facts can be gleaned from the jury's answers to Federal Civil Rule 49(a) special verdicts[8] and from the stipulations entered into by the parties.[9] On October 1, 1976 at approximately 4:30 p.m. plaintiff, accompanied by a female companion, was operating his 1976 Corvette automobile in the area of Fenwick Island, Delaware, in a southerly direction, en route to his condominium at the English Towers, Ocean City, Maryland. Defendant Goughan, a uniformed patrolman on the Fenwick Island police force, was operating a police vehicle owned by the Town of Fenwick Island. Travelling behind plaintiff's vehicle, Goughan activated his siren and flashing lights and signaled to plaintiff to stop his vehicle by the side of the road. The jury found that plaintiff stopped his vehicle at "the earliest practicable opportunity"[10] and that the stop occurred within the State of Mary-

land.[11] After the stop, plaintiff, at Goughan's request, handed his driver's license and registration to Goughan. Goughan informed plaintiff that plaintiff had exceeded the 35 mile per hour posted speed limit in Fenwick Island, Delaware, and ordered plaintiff to return to the Fenwick Island Town Hall to stand trial immediately. The jury found that plaintiff was not speeding in Fenwick Island and that Goughan did not act with "a reasonable good-faith belief that Korotki was driving carelessly in Fenwick Island, Delaware."[12]

Plaintiff, at the place of the stop, with knowledge that Goughan was a Delaware—and not a Maryland—police officer, refused to return to Fenwick Island and requested, instead, that Goughan return plaintiff's driver's license and registration and issue to plaintiff a citation. The Non-Resident Violator Compact,[13] then in effect between Maryland and Delaware,[14] provides, *inter alia*, that a traffic offender apprehended in a state other than the state of his residence shall be afforded the opportunity (1) to stand trial immediately in the jurisdiction in which the offense occurred or (2) to receive a voluntary assessment form, (*e.g.* citation),[15] and (a) to pay a fine by mail or (b) to appear for trial at a later date in the jurisdiction in which the offense occurred. Goughan refused plaintiff's request and insisted that plaintiff immediately accompany Goughan to the Fenwick Island Town Hall. Plaintiff, after stating to Goughan that plaintiff was going to drive his companion to the English Towers and that plaintiff would then meet

---

7. *See* Motion of Defendants, TOWN OF FENWICK ISLAND, CARTWRIGHT, BARTON and GOUGHAN, to enter Judgment in favor of the Defendants or, in the Alternative, to Grant them a New Trial or to enter Judgment Irrespective to the Jury Findings Contained in the Special Jury Questions propounded Pursuant to Federal Rule 49A and Memorandum, docket number 98, filed January 6, 1984.

8. Docket number 95, Special Verdict Form and Answers thereto, filed December 27, 1983, court file.

9. Factual Agreement appended to docket number 52.

10. Answer to Question 8, Special Jury Questions, docket number 95.

11. Answer to Question 5, Special Jury Questions, docket number 95.

12. Answers to Questions 1 and 4, Special Jury Questions, docket number 95.

13. *See* note 5, *supra.*

14. The Compact was entered into by the two States on October 20, 1972.

15. *See* n. 60, *infra.*

Goughan at the Ocean City Police Department, drove from the scene of the stop, without Goughan's permission, leaving plaintiff's license and registration in Goughan's possession, and headed toward the English Towers. The jury found that Goughan manuevered his vehicle in order to try to force Korotki to pull over to the side of the highway.[16] The jury further found that Goughan "attempted to prevent the Korotki vehicle from turning into the entrance to the English Towers."[17] The jury did not accept the testimony of plaintiff and his companion that Goughan, while the two vehicles were proceeding between the place of the stop and English Towers, pointed a gun at the Korotki vehicle.[18]

After plaintiff reached the English Towers, Goughan drove to the Ocean City Police Department and attempted to contact Ocean City Police Commissioner Treadwell in order to have a warrant issued for plaintiff's arrest. The Commissioner, upon the advice of the then State's Attorney for Worcester County, Maryland, Crawford, refused to issue a warrant for plaintiff's arrest. Thereafter, Goughan returned to the Fenwick Island Town Hall and contacted defendant Barton, then a judge of the Alderman's Court in the Town of Fenwick Island. Barton, who had jurisdiction over traffic offenses committed within the incorporated limits of Fenwick Island, Delaware, and who was empowered to issue arrest warrants for persons committing offenses within the Town,[19] placed a telephone call to the Ocean City Police Department in an effort to speak with Treadwell.[20] This Court, pursuant to its reserved authority under Federal Civil Rule 49(a) and in general conformity with and in the absence of any evidence to the contrary, hereby determines that Barton placed the call in order (a) to ascertain the factual circumstances surrounding the incident and (b) to decide whether issuance of an arrest warrant was appropriate. It is to be noted that Barton did not reach Treadwell and did not issue a warrant for plaintiff's arrest.

Goughan next prepared two traffic citations against plaintiff. The first[21] charged plaintiff with speeding in violation of Title 21, Section 4169(b) of the Delaware Code;[22] the second[23] charged plaintiff with careless driving in violation of Title 21, § 4176 of the Delaware Code.[24] Goughan on October

---

16. Answers to Questions 14 and 15, Special Jury Questions, docket number 95.

17. Answers to Questions 18 and 19, *Id.*

18. Answer to Question 16, *Id.*

19. Town of Fenwick Island Charter and Ordinances.

20. Answer to Question 23, *id.*

21. No. 33889.

22. Delaware Code § 4169(b) provides:
 (b) Whenever the Department of Transportation shall determine, on the basis of engineering studies and traffic investigations or upon the basis of a federal law or directive by the Congress or the President, that a maximum speed limit set pursuant to subsection (a) of this section in any particular place on the state maintained highway system is greater or less than is reasonable or safe, the Department shall declare a reasonable and safe maximum limit thereat, which limit shall be effective when posted. Such maximum limit may be declared to be effective either part or all of the time and differing limits may be established for different times of the day, for different types of vehicles, for different weather conditions and when other significant factors differ. Such maximum limits may be posted on fixed or variable signs. Any speed in excess of such displayed limits shall be absolute evidence that the speed is not reasonable or prudent and that it is unlawful.

23. No. 33891.

24. 21 Delaware Code § 4176 states:
 (a) Whoever operates a vehicle in a careless or imprudent manner, or without due regard for road, weather and traffic conditions then existing, shall be guilty of careless driving.
 (b) Whoever operates a vehicle and who fails to give full time and attention to the operation of the vehicle, or whoever fails to maintain a proper lookout while operating the vehicle, shall be guilty of inattentive driving.
 (c) Whoever violates this section shall be fined not less than $10 nor more than $100, or be imprisoned not less than 10 days nor more than 30 days or both. For each subsequent violation of this section, a person shall be

1, 1976 also advised defendant Orr, then Chief Judge of the Justice of the Peace Court No. 2 in Nassau, Delaware, of the facts surrounding plaintiff's stop. Judge Orr issued two warrants for plaintiff's arrest, based upon the two traffic citations issued by Goughan and Goughan's report of plaintiff's failure to obey Goughan's order to accompany Goughan to the Fenwick Island Town Hall. Goughan caused a report to be filed with the Department of Public Safety of the State of Delaware, stating that plaintiff had failed to comply with the traffic citations. Pursuant to the Compact,[25] the State of Delaware notified the State of Maryland Motor Vehicle Administration[26] of plaintiff's failure to comply with the Delaware citations. Based upon that notification, the Maryland Administrator initiated, in 1977, license suspension proceedings against plaintiff. After an administrative hearing and two unsuccessful appeals, plaintiff's driving license was ordered suspended unless plaintiff promptly appeared in a Delaware court in response to the Delaware citations.[27]

Thereafter, plaintiff filed a complaint in this Court, styled Korotki v. Intermann, B–77–1657, in which plaintiff, *inter alia,* sought relief pursuant to 42 U.S.C. §§ 1983 and 1985 for alleged violations of plaintiff's constitutional rights arising from the above-described traffic incident. Specifically, plaintiff therein sought to enjoin the Delaware and Maryland authorities from taking any action affecting plaintiff's driving privileges. In a Memorandum and Order filed on August 28, 1978, Judge Blair of this Court dismissed plaintiff's complaint, holding that pursuant to the principles of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971) and its progeny, this Court would not enjoin the pending Maryland and Delaware state proceedings. In that connection, Judge Blair wrote: "The court finds that principles of comity and federalism require it to abstain from consideration of each of plaintiff's claims until he has had an opportunity to assert his rights in appropriate state forums."[28]

Subsequently, plaintiff, appearing in the Justice of the Peace Court Number Two for Sussex County in November, 1979, and

---

fined not less than $25 nor more than $200, or imprisoned not less than 15 days nor more than 60 days or both. A subsequent violation, before being punishable as such, must have been committed with 24 months after the commission of the prior offense.

**25.** Article VI of the Compact, note 5 *supra,* provides for exchange of information between participating jurisdictions as follows:

**ARTICLE VI**
**COMPACT ADMINISTRATOR AND INTERCHANGE OF INFORMATION**
(a) The motor vehicle administrator of each party jurisdiction shall be the administrator of this compact for his jurisdiction. The administrators acting jointly, shall have the power to formulate all necessary and proper procedures for the exchange of information under this compact.
(b) The administrator of each party jurisdiction shall furnish to the administrator of each other party jurisdiction any information or documents reasonably necessary to facilitate the administration of this compact.

**26.** The Motor Vehicle Administration of the State of Maryland is an administrative agency within the Department of Transportation of the State of Maryland.

**27.** At a Maryland administrative hearing held on February 7, 1977, Hearing Examiner Kenny ordered plaintiff's license suspended if plaintiff did not appear in response to the Delaware citations within eleven days. Plaintiff, on February 17, 1977, filed an appeal from Examiner Kenny's decision to the Circuit Court for Baltimore County, Maryland. The Motor Vehicle Administration stayed the impending suspension, pending disposition of the appeal. Judge Land, of the Circuit Court for Baltimore County, affirmed the suspension of plaintiff's license by written order of October 27, 1978. Thereafter, on November 8, 1978, plaintiff's license was ordered suspended by the Motor Vehicle Administration. Plaintiff appealed to the Court of Special Appeals of Maryland on November 9, 1978 and obtained an order staying the suspension, pending appeal. After a further order on March 9, 1979 was filed by Judge Land, plaintiff was advised by the Motor Vehicle Administration that the stay of his license suspension was further extended. As to later developments concerning plaintiff's Maryland driving license, *see* body of this opinion, page ―― *infra.*

**28.** *See* August 23, 1978 Memorandum and Order at p. 4. Korotki's appeal to the Fourth Circuit from Judge Blair's Order was dismissed for want of prosecution.

in the Superior Court of Sussex County, Delaware, in July, 1980,[29] was found not guilty of both the speeding and careless driving charges originally lodged against him. The Motor Vehicle Administration of the State of Maryland, upon notification of the outcomes of those Delaware court proceedings, withdrew the pending Maryland license suspension proceedings against plaintiff.

The jury found, in answer to special questions, that Fenwick Island policemen, on or about October 1, 1976, followed a policy and a procedure of requiring out-of-state motorists, who were stopped by a Fenwick Island police officer on charges of speeding or careless driving, immediately to accompany the officer to the Fenwick Island Town Hall;[30] that Fenwick Island policemen, on or about October 1, 1976, followed a policy and a procedure of pursuing out-of-state motorists from Delaware into Maryland in order to issue traffic tickets to motorists for careless driving or speeding and in order to require such motorists immediately to accompany the police officer to the Fenwick Island Town Hall;[31] and that Fenwick Island policemen, as a matter of policy and practice in force and effect on or about October 1, 1976, did not comply with the terms of the Non-Resident Violator Compact.[32] Further, the jury found that Police Chief Cartwright and Judge Barton personally participated in the adoption and enforcement of those policies and procedures;[33] that Cartwright, Barton and the Town of Fenwick Island all knew, authorized or acquiesced in such policies and procedures;[34] and that the Town of Fenwick Island directly participated in the formulation, adoption and enforcement of such policies and procedures.[35]

The jury additionally found that Goughan, Barton and Cartwright did not act in good faith[36] in observing the Compact and that all three of the defendants[37] as well as the Town itself[38] acted intentionally, wantonly and willfully.

Based upon those findings and in accordance with this Court's instructions as to the law, the jury assessed the compensatory[39] and punitive[40] damages in the amounts set forth *supra* at 1367–1368.

## II. PLAINTIFF'S § 1985(3) CLAIM

In addition to his claim pursuant to 42 U.S.C. § 1983, plaintiff seeks relief under 42 U.S.C. § 1985(3),[41] alleging that the

---

29. The transcripts of the proceedings in the Justice of the Peace Court and the Superior Court were marked for identification as plaintiff's Trial Exhibits 8 and 9.

30. Answer to Question 24, Special Jury Questions, docket number 95.

31. Answer to Question 25, *id.*

32. Answer to Question 26, *id.*

33. Answer to Questions 27(b) and (c) and 30(b) and (c), *id.*

34. Answers to Questions 28, 29 and 31, *id.*

35. Answer to Question 32, *id.*

36. Answer to Questions 33, 34, and 35, *id.*

37. Answers to Questions 53, 55 and 57, *id.*

38. Answer to Question 59, *id.*

39. Answers to Question 44, Revised Questions 49(a) and (b), and Questions 50 and 51, *id.*

40. Answers to Questions 54, 56, 58 and 60, *id.*

41. 42 U.S.C. § 1985(3) provides:

(3) If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived

Town of Fenwick Island and the three individual defendants engaged in a conspiracy to discriminate against non-resident motorists by requiring the latter immediately to stand trial while at the same time permitting Delaware resident motorists to post nominal bond and to return for trial at a later date. Defendants argue that plaintiff has failed to allege and prove an essential element in a § 1985(3) action, namely, class-based animus, as required by *Griffin v. Breckenridge*, 403 U.S. 88, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). With the consent of the parties, this Court deferred determination, with regard to the § 1985(3) claim, pending the completion of the jury trial, indicating, however, during pretrial proceedings, that the Court was tentatively of the view that plaintiff had failed to allege and proffer the requisite class-based animus under § 1985(3), but that because plaintiff's conspiracy allegations could, in any event, go to the jury under a common law conspiracy theory, this Court would await the jury's verdicts before determining the 1985(3) issues.[42]

With the trial concluded, it is evident that plaintiff has failed to state a claim under § 1985(3) because of the absence of essential class-based animus. In order to make out a § 1985(3) claim, a plaintiff must show first, that defendants engaged in a conspiracy which had the purpose of depriving the plaintiff of "equal protection of the laws, or of equal privileges and immunities under the laws," 42 U.S.C. § 1985(3), and second, that the conspiracy was motivated by "some racial, or perhaps otherwise class-based, invidiously discriminatory animus ...." *Griffin v. Breckenridge*, 403 U.S. *supra* at 102, 91 S.Ct. at 1798. § 1985(3) creates "no substantive rights", but merely "provides a remedy for violation of the rights it designates." *Great American Federal Savings and Loan Association v.*

*Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1979). While Korotki has proven the existence of a conspiracy designed to interfere with his right to interstate travel, a right guaranteed by the Federal Constitution and recognized as falling within the protective ambit of § 1985(3), *see United Brotherhood of Carpenters v. Scott*, 463 U.S. 825, ——, 103 S.Ct. 3352, 3358, 77 L.Ed. 1049, 1057 (1983); *Griffin v. Breckenridge*, 403 U.S. 88, 103, 91 S.Ct. 1790, 1799, 29 L.Ed.2d 338 (1971); *Means v. Wilson*, 522 F.2d 833, 838 (8th Cir.1975), *cert. denied*, 424 U.S. 958, 96 S.Ct. 1436, 47 L.Ed.2d 364 (1976), Korotki was not a member of any protected class; nor was he invidiously discriminated against as a member of any class. The class-based animus requirement set forth in *Breckenridge* is designed to prevent § 1985(3) from becoming a "general federal tort law." *Id.* 403 U.S. at 102, 91 S.Ct. at 1798. In *Breckenridge*, the facts revealed an animus against blacks and those who supported them. In *Breckenridge*, Judge Stewart explicitly noted that the Court declined to "decide, given the facts of this case, whether a conspiracy motivated by invidiously discriminatory intent other than racial bias would be actionable under the portion of § 1985(3) before us." *Id.* at 102 n. 9, 91 S.Ct. at 1798 n. 9.

Recently, the Supreme Court has had another occasion to examine the "class-based animus" requirement in § 1985(3) actions. In *United Brotherhood of Carpenters v. Scott, supra*, the Court held that a conspiracy to harm the non-union employees of a non-union contractor does not embody the kind of class-based animus contemplated by § 1985(3), and that § 1985(3) does not reach conspiracies motivated by economic or commercial animus. In so

of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**42.** Pretrial conferences held on the record on October 18, 1983 and November 21, 1983. While plaintiff did not originally allege a common law conspiracy, he was permitted, before trial, over defendants' objection, to amend orally plaintiff's complaint to allege a common law conspiracy claim.

holding,[43] Justice White commented extensively as to the nature of the animus to which § 1985(3) is directed and the groups or classes sought to be protected by the statute. In so doing, the Justice referred to conditions as they existed in 1871 and to the legislative history of § 1985(3), observing that "it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes and those who championed their cause ...." *Id.* 463 U.S. at ——, 103 S.Ct. at 3359, 77 L.Ed.2d at 1059. While noting the broad scope of § 1985(3) as originally introduced in Congress, the Justice accorded great weight to the "narrowing amendment", *id.* at ——, 103 S.Ct. at 3359, 77 L.Ed.2d at 1059, which was adopted in the final version of the statute, quoting as follows (at ——, 103 S.Ct. at 3359, 77 L.Ed.2d at 1058) from *Breckenridge*, 403 U.S. at 102, 91 S.Ct. at 1798:

> The constitutional shoals that would lie in the path of interpreting § 1985(3) as a general federal tort law can be avoided by giving full effect to the congressional purpose—by requiring, as an element of the cause of action, the kind of invidiously discriminatory motivation stressed by the sponsors of the limiting amendment. See the remarks of Representatives Willard and Shellabarger, quoted supra, at 100. The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action. The conspiracy, in other words, must aim at a deprivation of the equal enjoyment of rights secured by the law to all.

Justice White also noted (463 U.S. at ——, 103 S.Ct. at 3359, 77 L.Ed.2d at 1059) that while "there is some legislative history to support the view that § 1985(3) has a broader reach," a broad interpretation of the statute did not appear warranted:

> The narrowing amendment, which changed § 1985(3) to its present form,

was proposed, debated, and adopted there, and the Senate made only technical changes to the bill. Senator Edmunds's views, since he managed the bill on the floor of the Senate, are not without weight. But we were aware of his views in *Griffin*, 403 U.S., at 102 n. 9 [91 S.Ct., at 1798 n. 9], and still withheld judgment on the question whether § 1985(3), as enacted, went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended effects of the Thirteenth, Fourteenth, and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here.

*Id.* at ——–——, 103 S.Ct. at 3359–60, 77 L.Ed.2d at 1059–60. In another portion of his opinion, Justice White wrote:

> [B]oth [courts below] held that the section not only reaches conspiracies other than those motivated by racial bias but also forbids conspiracies against workers who refuse to join a union. We disagree with the latter conclusion and do not affirm the former.

*Id.* at ——, 103 S.Ct. at 3359, 77 L.Ed.2d at 1058.

Near the end of his opinion in *Scott*, Justice White concluded that, assuming *arguendo*, § 1985(3) does reach conspiracies other than those based on racial animus, "we thus cannot construe § 1985(3) to reach conspiracies motivated by economic or commercial animus." *Id.* at ——, 103 S.Ct. at 3360, 77 L.Ed.2d at 1060, and that

> group actions generally resting on economic motivations should be deemed beyond the reach of § 1985(3). Economic and commercial conflicts, we think, are best dealt with by statutes, federal or state, specifically addressed to such problems, as well as by the general law proscribing injuries to persons and property.

*Id.* at ——, 103 S.Ct. at 3361, 77 L.Ed.2d at 1061.

---

**43.** *Id.* 463 U.S. at ——–——, 103 S.Ct. at 3360–61, 77 L.Ed.2d at 1060–61.

Herein, plaintiff contends that the Town and the three individual Fenwick Island defendants engaged in a conspiracy against non-resident motorists in order to raise revenues for the Town's coffers. Such "individiously discriminatory animus" is not of the nature required by *Breckenridge* and *Scott;* nor do non-resident drivers constitute a protected "Griffin" class. As *Scott* emphasizes, classes or groups protected under § 1985(3) are to be determined by reference to legislative history and to those groups involved in the struggle in the south in 1871. In enacting the Ku Klux Klan Act, the Reconstruction Congress sought to provide special federal assistance to those groups whose members had been historically disadvantaged and who required such assistance in protecting their civil rights.[44] Non-resident drivers do not qualify as a historically disadvantaged group in need of special assistance in exercising their rights.[45] A class protected by § 1985(3) must be "possessed of discrete, insular and immutable characteristics comparable to those characterizing classes such as race, national origin and sex." *Savina v. Gebhart,* 497 F.Supp. 65, 68 (D.Md.1980) (Howard, J.) quoting from *Bellamy v. Mason's Stores, Inc.,* 368 F.Supp. 1025, 1028 (E.D.Va.1973) (Merhige, J.), *aff'd.* 508 F.2d 504 (4th Cir.1974). Non-resident drivers, to the extent that they constitute a group, do not possess "discrete, insular and immutable characteristics." It is true that in some pre-*Scott* opinions, lower federal courts seemingly construed the class-based animus requirement quite broadly. *See Means v. Wilson, supra,* at 839–40; *Azar v. Conley,* 456 F.2d 1382 (6th Cir.1972); *Folgueras v. Hassle,* 331 F.Supp. 615 (W.D.Mich.1971). But in post-*Scott* opinions, lower federal courts have not so done. *See* in *Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1175–77 (10th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984), in which the Court concluded that "a class of 'handicapped persons' was not in the contemplation of Congress in 1871, and was not included as a class in what is now § 1985(3)" and wrote (at 1177):

We are concerned with a statute enacted for a particular purpose and to meet particular conditions. The rights and privileges sought to be protected (as contrasted to the "class") are diverse and with the constitutional overtones are to be construed broadly. However, the classes or groups to be protected are instead to be derived from statutory construction. This in our view the Supreme Court has done in *Scott* and *Griffin.* From *Scott* we repeat part of a quotation appearing above. Thus after referring to *Griffin* and noting that the Court there withheld judgment as to whether § 1985(3) "went any farther than its central concern—combatting the violent and other efforts of the Klan and its allies to resist and to frustrate the intended affects of the Thirteenth, Fourteenth, and Fifteenth Amendments. Lacking other evidence of congressional intention, we follow the same course here." Thus the Court also withheld judgment, but the significant part of the statement is that the refusal to go farther was placed on the reason—lacking other evidence of congressional intention.

Similarly, in *Nilan v. De Meo,* 575 F.Supp. 1225, 1226–27 (E.D.Pa.1983), Judge Pollak concluded that § 1985(3) did not, in light of *Scott,* apply to a conspiracy to deprive plaintiffs of their jobs because of their political affiliation and activity, despite previous Second and Third Circuit expressions of views to the contrary in a pre-*Scott* context. Judge Pollak noted (at 1227) that *Scott* "expressed the Supreme Court's considerable reluctance to involve

---

**44.** *See, e.g., Carchman v. Korman Corp.,* 594 F.2d 354 (3d Cir.1979), *cert. denied,* 444 U.S. 898, 100 S.Ct. 205, 62 L.Ed.2d 133 (1979); *Bethel v. Jendoco Construction Corp.,* 570 F.2d 1168, 1172–73 (3d Cir.1978).

**45.** *See Scott, supra; see also Wilhelm v. Continental Title Co.,* 720 F.2d 1173, 1175–77 (10th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 1601, 80 L.Ed.2d 131 (1984) (involving the handicapped and relying upon *Scott* ).

the federal courts in policing politics through section 1985(3)'s tort remedy."

■ In sum, Korotki's § 1985(3) claim fails for two reasons. First, conspiracies motivated by commercial-type animus are not actionable under § 1985(3) in the wake of *Scott;* and second, non-resident motorists do not constitute a cognizable class within the meaning of the statute. Accordingly, defendants' motion to dismiss plaintiff's § 1985(3) claim is granted. However, while plaintiff has failed to allege or proffer a § 1985(3) conspiracy claim, plaintiff has introduced sufficient evidence to sustain the jury's finding as to a civil conspiracy, based upon Maryland common law. "A civil conspiracy is a combination of two or more persons by an agreement or understanding to accomplish an unlawful act or to use unlawful means to accomplish an act not in itself illegal, with the further requirement that the act or the means employed must result in damages to the plaintiff." *Green v. Washington Suburban Commission,* 259 Md. 206, 221, 269 A.2d 815 (1970). In this case, plaintiff has established that defendants engaged in the practice of and followed the policy of depriving non-resident motorists such as Korotki of the benefits of the Compact, thereby violating those non-residents' rights and causing damage to Korotki. Accordingly, Korotki has proved the tort of common law conspiracy under Maryland law.

## III. PUNITIVE DAMAGES AGAINST A MUNICIPALITY

■ In a post-trial motion, defendants moved to strike the $100,000 award of punitive damages assessed against Fenwick Island, asserting for the first time in this case that punitive damages are not recoverable against a municipality in a § 1983 action and citing to *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). In *Newport,* the municipality cancelled a license for a rock music concert because the City Council feared that the concert would draw large, unruly crowds. The concert promoter, alleging that the City's actions violated

his first amendment rights, brought suit under § 1983. The jury, answering Rule 49(a) questions, awarded punitive damages of $275,000, including a $200,000 punitive damages award against the City. The City thereafter moved for a new trial, arguing that punitive damages could not be awarded against a municipality.

In holding that "a municipality is immune from punitive damages under 42 U.S.C. § 1983," *id.* at 271, 101 S.Ct. at 2762, Justice Blackmun examined the legislative history of § 1983 in order to determine whether there existed any legislative intent with regard to allowance of punitive damages against a municipality. Concluding that "municipal immunity from punitive damages was well established at common law by 1871," *id.* at 264, 101 S.Ct. at 2758, Justice Blackmun wrote that 'Congress would have specifically so provided had it wished to abolish the doctrine.'" 453 U.S. at 263, 101 S.Ct. at 2757, citing to *Pierson v. Ray,* 386 U.S. 547, 555, 87 S.Ct. 1213, 1218, 18 L.Ed.2d 288 (1967), and then concluded:

We see no reason to believe that Congress' opposition to punishing innocent taxpayers and bankrupting local governments would have been less applicable with regard to the novel specter of punitive damages against municipalities.

*Id.* 453 U.S. at 266, 101 S.Ct. at 2759.

In that context, Justice Blackmun considered whether public policy concerns underlying punitive damages, namely, retribution and deterrence, dictated a contrary result, and found no rationale supporting a punitive damages award harmonious with the policies of § 1983. The Justice concluded that the retribution rationale for punitive damages would not be served by awarding such damages against a municipality because the economic burden would fall on the taxpayers who were "blameless." *Id.* at 267, 101 S.Ct. at 2760. As to the deterrence rationale for such an award, the Justice noted that punitive damages assessed against a municipality might not deter individual wrongdoers. Justice

Blackmun also wrote (at 267, 101 S.Ct. at 2760) that—

> punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or a reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.[29]

> [29] It is perhaps possible to imagine an extreme situation where the taxpayers are directly responsible for perpetrating an outrageous abuse of constitutional rights. Nothing of that kind is presented by this case. Moreover, such an occurrence is sufficiently unlikely that we need not anticipate it here.

As far as this Court is informed, no court in the wake of *Newport* has yet to find a situation which has called for the application of the footnote 29 possibility stated by Justice Blackmun.[46] In *Webster v. City of Houston,* 689 F.2d 1220 (5th Cir.1982), *reh'g granted,* 711 F.2d 35 (5th Cir.1983), the City engaged in a practice of employing "throw-downs," whereby a police officer who killed or injured an unarmed suspect would "throw down" a weapon at the sus-

pect's side in order to cover up any police misdeed. Although the City's practice, which resulted in loss of life, was labeled "reprehensible," the Fifth Circuit held that it does "not rise to the level of outrageous conduct to which [footnote 29] referred", 689 F.2d at 1229, and also emphasized that § 1983 was "enacted in a time of frightening violence, to ensure the most basic constitutional rights of citizens in southern states. If the members of Congress who drafted that Act did not intend to establish a rule of punitive damages, we believe that it would take a *far more serious* violation that we confront to ground punitive damages against Houston." *Id.* (emphasis added). Accordingly, Judge Brown in *Webster* struck the punitive damages portion of the jury award.[47]

In *Heritage Homes v. Seekonk Water District,* 670 F.2d 1, 2 (1st Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2934, 73 L.Ed.2d 1333 (1982), plaintiff, a developer, argued that the case fell within *Newport's* footnote 29 because the taxpayers themselves discriminated against the developer in voting to exclude him from the district

---

**46.** *See, e.g., Miller v. City of Mission, Kan.,* 705 F.2d 368, 377–78 (10th Cir.1983); *White v. Washington Public Power Supply System,* 692 F.2d 1286, 1290 (9th Cir.1982); *Iskander v. Village of Forest Park,* 690 F.2d 126, 131 (7th Cir. 1982); *Webster v. City of Houston,* 689 F.2d 1220, 1228–29 (5th Cir.1982), *reh'g. granted,* 711 F.2d 35 (5th Cir.1983); *Phillips v. Hunter Trails Community Association,* 685 F.2d 184, 191 (7th Cir.1982); *Hays v. Jefferson County, Ky.,* 668 F.2d 869, 875 (6th Cir.1982); *Ray v. City of Edmond,* 662 F.2d 679, 680 (10th Cir.1981); *Jensen v. Conrad,* 570 F.Supp. 91, 99 (D.S.C.1983); *Bell v. City of Milwaukee,* 536 F.Supp. 462, 474–75 (E.D.Wis.1982); *Peters v. Township of Hopewell, N.J.,* 534 F.Supp. 1324, 1338 (D.N.J.1982), *aff'd.,* 729 F.2d 1448 (1984); *Tolbert v. County of Nelson,* 527 F.Supp. 836, 839 (W.D.Va.1981); *Bomhoff v. White,* 526 F.Supp. 488, 492–3 (D.Az. 1981); *Tyler v. Board of Education of New Castle County Vocational-Technical School District,* 519 F.Supp. 834, 837 (D.Del.1981).

**47.** In *Webster,* Judge Goldberg, in a special concurrence wrote:

> It is with considerable grief that I write to specially concur in the result denying punitive damages against the City of Houston. I fully concur in the majority opinion on all other

issues, but must specially concur on the issue of punitive damages because the majority suggests that *City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), might allow punitive damages against a municipality in a section 1983 suit if the facts were particularly egregious. Would that it were so, for then I could, with clear *judicial* conscience, urge taxing the City of Houston with punitive damages. If there were any narrow gap around *Newport* for an egregious case, this one would slip through; I am aghast at the thought that any violation of constitutional rights more appalling, more threatening than the one that occurred here might actually exist. Sadly, I view *Newport* as presenting an impenetrable barrier to punitive damages. Would that it were not so, for now I must, with troubled *human* conscience, concur in this unfortunate result.

> 689 F.2d at 1230–31.

At another point in his concurrence, Judge Goldberg concluded:

> I believe [that] ... rather than creating an exception, this footnote precludes any exception.... The bottom line of the opinion admits of no exceptions: "[w]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983." 101 S.Ct. at 2762.

> 689 F.2d at 1231 (footnote omitted).

because he was willing to sell homes to black persons. The court rejected that argument, stating:

> [w]e conclude that the facts of this case do not fit into any exception that the Court is likely to carve out of its broad holding that "a municipality is immune from punitive damages under 42 U.S.C. § 1983." *Id.* [453 U.S.] at 271 [101 S.Ct. at 2762]. Of the thousands of members of the Water District, only some 80 to 85 attended the crucial meeting. Of these 66 voted to exclude and 8 voted to include Heritage Homes. Absent widespread knowledgeable participation by taxpayers, the analogy to municipal officials seems apt: to award punitive damages against the Water District would not serve the purposes of punishment or deterrence. As the Court observed, "blameless or unknowing" taxpayers would be punished by imposing punitive damages here. The actions of a small claque of voters would burden several thousand nonparticipants, many of whom presumably were unaware of the entire controversy.

*Id.* at 2 (footnote omitted).

In *Wade v. Cicero, Illinois,* 571 F.Supp. 157, 158–59 (N.D.Ill.1983), the Court held that if *Newport's* footnote 29 did create an exception, the facts of that case did not bring it within such an exception. Plaintiffs there argued that the citizens of the town had "promoted a climate of racial hatred such that the municipal officials ... were merely ratifying the egregiously discriminatory views of Cicero's citizens." *Id.* at 159. The court noted that plaintiffs had not alleged that " 'the taxpayers are directly responsible' for the challenged actions," and that indirect responsibility would not suffice under footnote 29. The court wrote:

> Again, without meaning to denigrate the seriousness of these allegations, we do not believe that they impute direct responsibility to all of the taxpayers of Cicero. See *Heritage Homes, supra.* If footnote 29 creates an exception at all, the exception would appear to be applicable more in the case, say, of a referen-

dum in which the voters overwhelmingly mandated an unconstitutional action. See *Webster, supra,* at 1231 n. 1 (Goldberg, J., specially concurring).

*Id.* at 159.

In the within case, as in *Wade,* there is no evidence that the taxpayers of Fenwick Island were themselves directly responsible for the policy of violating the non-resident Violator Compact. While plaintiff contends that the unlawful policies and practices of Fenwick Island were based upon the desire of Fenwick Island to keep its tax rates low and its revenues high, that does not add up to direct responsibility or to "widespread knowledgeable participation by taxpayers." *See Heritage Homes, supra.* If the conduct in *Webster,* which resulted in loss of life, did not satisfy the "outrageous abuse" standard of footnote 29, then, *a fortiori,* the conduct complained of here would appear to fall short of the mark.

█ In a pretrial proceeding in this case, at a time when *Newport* was pending in the Supreme Court, this court called that case to the attention of counsel. However, no objection was raised, before or during trial or in connection with preparation of jury instructions or formulation of special questions, by the Town of Fenwick Island or by any other defendant, to the introduction of evidence relevant to plaintiff's claim for punitive damages against the Town of Fenwick Island or to the submission of any special questions relating to that claim. Accordingly, the question arises as to whether defendant Town of Fenwick Island's motion is barred by Federal Civil Rule 51, which provides in relevant part:

**Rule 51. Instructions to Jury: Objection**

 • • • •

No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Oppor-

tunity shall be given to make the objection out of the hearing of the jury.

. . . . .

The object of this rule is to afford the trial judge an opportunity upon second thought, and before it is too late, to correct any inadvertent or erroneous failure to charge. The rule also serves to lessen the potential burden of appellate courts by diminishing the number of rulings at the trial which they may be called upon to review.

*Marshall v. Nugent,* 222 F.2d 604, 615 (1st Cir.1955) (Magruder, C.J.). *See* 9 Wright & Miller, Federal Practice and Procedure, Civil § 2551 at 623 (1971).

A similar Rule 51 contention was raised in *Newport,* in which respondents asserted that "the punitive damages issue was not properly preserved for review before this Court." 453 U.S. at 255, 101 S.Ct. at 2753. In rejecting that position, Justice Blackmun emphasized that the district court had refused to rely upon the Rule 51 bar and had, instead, "reached and fully adjudicated" the merits, *id.* at 256, 101 S.Ct. at 2754, in the context of defendant City of Newport's post-trial motion. In so doing, the Justice observed (at 256 n. 12, 101 S.Ct. at 2754 n. 12):

> The District Court may have been influenced by the unusual nature of the instant situation. Ordinarily, an error in the charge is difficult, if not impossible, to correct without retrial, in the light of the jury's general verdict. In this case, however, we deal with a wholly separable issue of law, on which the jury rendered a special verdict susceptible of rectification without further jury proceedings.

In the within case, the jury also returned answers to special questions pursuant to Federal Civil Rule 49(a). In response to questions in which the issues were separately framed, the jury returned a punitive damages award of $100,000 against the Town of Fenwick Island. That award can, as was the case in *Newport,* be vacated without the need to convene another jury. Further, in any event, this case also fits

into the "plain error" exception of Rule 51, an exception which may and should be invoked when the error is obvious and prejudicial or where "a miscarriage of justice" would result if the error went unremedied. *See, e.g., Cruthirds v. RCI, Inc.,* 624 F.2d 632, 635 (5th Cir.1980); *Barger v. Mayor and City Council of Baltimore,* 616 F.2d 730, 733 (4th Cir.) (Winter, J.) *cert. denied,* 449 U.S. 834, 101 S.Ct. 105, 66 L.Ed.2d 39 (1980) quoting from *United States v. The Board of Education of the County of Mineral,* 253 F.2d 760, 765 (4th Cir.1958). In *Miller v. Premier Corp.,* 608 F.2d 973, 983 (4th Cir.1979), Judge Phillips wrote that where "the instruction plainly misstated fundamentally controlling substantive principles governing [defendant's] right to recover on its counterclaims," the plain error in the instruction would overcome the bar of Rule 51. Similarly, in *Williams v. City of New York,* 508 F.2d 356, 361–62 (2d Cir.1974), the Second Circuit applied the plain error exception to a punitive damages instruction which had permitted the jury to find the City liable for such damages on the basis of its agents' wrongdoings. In *Williams,* the Second Circuit disapproved of the punitive damages award against the City because "the demonstrable deviation of the court's instruction here from the appropriate standard, the serious harm suffered by the defendant as a result of this error, and the remediability of this error without a new trial below, combine to justify overlooking counsel's failure timely to object in this instance." *Id.* at 362. Herein, also, the punitive damages award would substantially harm the Town of Fenwick Island. Accordingly, Rule 51 does not stand in the way of this court's favorable determination of the post-trial motion of defendant Town of Fenwick Island. Therefore, the punitive damage award against the Town will be set aside insofar as plaintiff's § 1983 claim is concerned.

■ Nor are punitive damages available to plaintiff against the Town of Fenwick Island in connection with plaintiff's state law-based contentions. As a federal court

not sitting in a diversity context,[48] but exercising pendent jurisdiction, this Court must apply the conflict of laws rule of the State of Maryland, the forum state. *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *System Operations Inc. v. Scientific Games Development Corporation*, 555 F.2d 1131, 1136 (3d Cir.1977); *Cf. Klaxon v. Stentor Electric Manufacturing Co., Inc.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The rule of *lex loci delicti* is well established in Maryland and requires application of the substantive tort and damages law of the state in which the wrong occurs. In *Hauch v. Connor*, 295 Md. 120, 123, 453 A.2d 1207 (1983), the Court of Appeals of Maryland recently reaffirmed the continued vitality of the *lex loci delicti* rule as a means of determining the applicable tort law:

> With regard to tort conflicts principles, we reject the position of the Restatement and adhere to the rule that the substantive tort law of the state where the wrong occurs governs. The rule of *lex loci delicti* is well established in Maryland. When its rationale has been put into question, "this Court has consistently followed the rule," *White v. King*, 244 Md. 348, 352, 223 A.2d 763 (1966).[49]

In this case, the jury found that the wrong occurred in Maryland.[50] Under Maryland law, a municipality may not be sued for punitive damages. *Herilla v. Mayor and City Council of Baltimore*, 37 Md.App. 481, 492, 378 A.2d 162 (1977), in which Chief Judge Gilbert of the Court of Special Appeals wrote:

> Generally, in the absence of statutory authority, exemplary or punitive damages may not be recovered against a municipality. [citations omitted]. There is no such statutory authority in Maryland, ....

Thus, plaintiff's state-based claims for punitive damages against defendant Town of Fenwick Island,[51] as well as plaintiff's § 1983 claims for such damages against that defendant, may not prevail. Accordingly, the motion of defendant Town of Fenwick Island to strike the jury's $100,000 award against it will be granted.

## IV. JUDICIAL IMMUNITY OF DEFENDANT BARTON

■ Although defendant Barton did not actually issue a warrant for plaintiff's arrest, the jury awarded plaintiff compensatory and punitive damages against defendant Barton. In a post-trial motion,[52] defendant Barton contends that that award cannot stand in the face of his entitlement

---

**48.** *See* note 6, *supra.*

**49.** In *Hauch*, Judge Eldridge also wrote (295 Md. at 125, 453 A.2d 1207):

> In addition to the principle of *stare decisis*, other reasons support our adherence to the rule of *lex loci delicti* for determining the applicable tort law. A virtue of the rule, for the courts and all parties concerned, is the predictability and certainty as to which state's tort law will govern.
> *See White v. King, supra*, 244 Md. at 355 [223 A.2d 763].

**50.** *See* Question 5, Special Jury Questions, docket number 95.

**51.** Even if this court were to assume arguendo that Delaware, rather than Maryland, law applied, it appears that punitive damages could not be assessed against Fenwick Island. In a recent case, *Smith v. New Castle County Vocational-Technical School District*, 574 F.Supp. 813 (D.Del.1983), plaintiff sought to recover punitive

damages against a political subdivision. In holding that such damages were not recoverable under Delaware law, Judge Schwartz wrote (at 822–23):

> The parties have not cited, nor has the Court found, any case under Delaware law on this issue. The General Assembly has taken a restrictive attitude toward the waiver of sovereign immunity, *see Pajewski v. Perry*, 363 A.2d 429, 435–36 (Del.1976) suggesting that the Delaware Supreme Court would not recognize a punitive damage claim against a political subdivision. Cf. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259–63, 101 S.Ct. 2748, 2755–58, 69 L.Ed.2d 616 (1981) (municipalities at common law not subject to punitive damages). Without an indication that the Delaware courts would allow recovery of punitive damages on a tort claim against a political subdivision of the State, this Court has no basis to find that such a claim would be recognized by the Supreme Court of Delaware.

**52.** *See* n. 7, *supra.*

to absolute judicial immunity. In answer to special questions, the jury found that Barton knew of and participated in the policy and procedure of requiring non-resident drivers to stand trial immediately,[53] and that he (Barton) acted in furtherance of that policy by placing a telephone call to Maryland State Commissioner Treadwell, presumably to secure a warrant for plaintiff's arrest.[54] Plaintiff, in response to defendant Barton's claim of judicial immunity, argues that Barton acted in the clear absence of jurisdiction and also that Barton's placement of a telephone call to Commissioner Treadwell did not constitute a "judicial" act. *Stump v. Sparkman,* 435 U.S. 349, 360, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978).

In 1872, the Supreme Court wrote that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself," *Bradley v. Fisher,* 13 Wall 335, 347, 20 L.Ed. 646 (1872), quoted from *Stump v. Sparkman, supra,* 435 U.S. at 355, 98 S.Ct. at 1104. The Court in *Bradley* held that "judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." 13 Wall at 351, 20 L.Ed. 646, also quoted from *Stump v. Sparkman, supra,* 435 U.S. at 355–56, 98 S.Ct. at 1104–05 (footnote omitted). Further, the Court has specifically held that judicial immunity is applicable to suits under § 1983 of the Civil Rights Act. *Pierson v. Ray,* 386 U.S. 547, 548, 554–55, 87 S.Ct. 1213, 1215, 1217–18, 18 L.Ed.2d 288 (1967).

Judicial immunity is applicable to judges at all levels. "A judge, of whatever status in the judicial hierarchy, is immune from suit for damages resulting from any act performed in the judicial role." *Ammons v. Baldwin,* 705 F.2d 1445, 1447 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 999, 79 L.Ed.2d 232 (1984) (Rubin, J.). Cases are legion in holding that judicial immunity extends to aldermen and justices of the peace.[55] Accordingly, in the within case defendant Barton enjoys judicial immunity unless he acted in the clear absence of all jurisdiction or his actions did not constitute judicial acts.

■ In *Stump v. Sparkman, supra,* 435 U.S. at 357 n. 7, 98 S.Ct. at 1105 n. 7, Justice White noted the difference between acts done in error or in excess of jurisdiction, which are covered by judicial immunity, and acts done *clearly* without jurisdiction, to which no immunity attaches:

> In *Bradley,* the Court illustrated the distinction between lack of jurisdiction and excess of jurisdiction with the following examples: if a probate judge, with jurisdiction over only wills and estates, should try a criminal case, he would be acting in the clear absence of jurisdiction and would not be immune from liability for his action; on the other hand, if a judge of a criminal court should convict a defendant of a nonexistent crime, he would merely be acting in excess of his jurisdiction and would be immune. [*Bradley*] [13 Wall] at 352 [20 L.Ed. 646].

In *Simons v. Bellinger,* 643 F.2d 774, 786 (D.C.Cir.1980), Judge Richey, sitting by designation, wrote that "with respect to immunity, 'jurisdiction' ought to be defined broadly to include acts 'having more or less

---

**53.** Questions 27(b) and (c), Special Jury Questions, docket number 95.

**54.** Question 23, *id.*

**55.** *See, e.g. Ammons v. Baldwin,* 705 F.2d 1445, *supra; Brewer v. Blackwell,* 692 F.2d 387, 396 (5th Cir.1982); *O'Neil v. City of Lake Oswego,* 642 F.2d 367, 369 (9th Cir.1981); *McClain v. Brown,* 587 F.2d 389, 390 (8th Cir.1978); *Grego-*

*ry v. Thompson,* 500 F.2d 59, 62 (9th Cir.1974); *Berg v. Cwiklinski,* 416 F.2d 929, 931 (7th Cir. 1969); *Fanale v. Sheehy,* 385 F.2d 866, 868 (2d Cir.1967); *Pagano v. Hadley,* 535 F.Supp. 92, 94 (D.Del.1982); *Paddleford v. Biscay,* 307 F.Supp. 343, 344–5 (N.D.Cal.1969); *Danner v. Moore,* 306 F.Supp. 433, 436–7 (W.D.Pa.1969); *Pritt v. Johnson,* 264 F.Supp. 167, 170 (M.D.Pa.1967).

connection with the general matters committed by law' to the official's supervision," quoting from *Spalding v. Vilas,* 161 U.S. 483, 498, 16 S.Ct. 631, 637, 40 L.Ed. 780 (1896), and went on to note that "... an act is within the official's jurisdiction if it is not 'manifestly or palpably beyond his authority.'" *Id.* Similarly, in *Fanale v. Sheehy,* 385 F.2d 866, 868 (2d Cir.1967), Judge Hays observed, in a case brought under sections 1983 and 1985(3), that "[e]ven if the justice of the peace was in error in resolving these questions of jurisdiction, he is not liable under the Civil Rights Act. Where jurisdiction depends on the resolution of factual issues or involves debatable questions of law, judges do not lose their immunity." In *Fanale,* Judge Hays held that a justice of the peace who, plaintiff alleged, *inter alia,* signed a defective information, was entitled to absolute immunity. In *Pagano v. Hadley,* 535 F.Supp. 92, 96 (D.Del.1982), Judge Stapleton commented: "An actual absence of jurisdiction ... will not deprive a judge of absolute immunity if there is some rational basis upon which the judge might have concluded that he possessed jurisdiction." [56]

In this case, defendant Barton did not act in the *clear* absence of all jurisdiction. While scant evidence was adduced at trial as to Alderman Barton's jurisdiction, the parties have submitted in the post-trial period copies of relevant state and local laws which delineate the scope of an alderman's jurisdiction in Delaware. Under those laws, defendant Barton had jurisdiction over traffic offenses occurring within the Town of Fenwick Island and was responsible for signing arrest warrants and hearing traffic cases. The Charter of the Town of Fenwick Island, Delaware [57] provides that the elected Town Alderman "shall

have jurisdiction and cognizance of all breaches of the peace and other offenses committed within the limits of the Town so far as to arrest and hold to bail or fine and imprison offenders of all fines, penalties and forfeitures described by this Charter or ordinances enacted hereunder." Further, the Delaware Ordinances in effect in October, 1976, contained a section entitled "Special Provisions Applying to Alderman's Court No. 34, Sussex County, Delaware." That section provided that the Alderman has "power and authority to hold for bail, and fine, or compel the attendance of persons accused of violations of the Town ordinances by service of process either within or without the limits of the Town, and compel the attendance of witnesses, and hold or punish for contempt." [58] Furthermore, Charles M. Oberly, III, Attorney General for the State of Delaware, has submitted an opinion letter to counsel for defendant Barton in which he states that "an alderman has the right to issue a warrant for an arrest occurring within the jurisdiction of the particular locality even if the arrest should occur outside the locality." [59] In light of the above, it appears that defendant Barton had jurisdiction to issue warrants for offenses committed within the Town of Fenwick Island and likely had jurisdiction to do the same with regard to offenses which began, but were not completed, within the incorporated limits of the Town.

While the jury has determined that the stop of plaintiff's vehicle occurred in Maryland, the alleged act of speeding began in Fenwick Island. Thus, defendant Barton seemingly had subject matter jurisdiction to issue a warrant for an offense which took place in Fenwick Island and to investigate such an offense in an effort to deter-

---

56. *See also O'Neil v. City of Lake Oswego,* 642 F.2d 367, 369 (9th Cir.1981); *Verner v. State of Colorado,* 533 F.Supp. 1109, 1115 (D.Colo.1982), *aff'd.,* 716 F.2d 1352 (10th Cir.1983).

57. A copy of the relevant provisions of the Charter of the Town of Fenwick Island, Delaware (incorporated July 8, 1953) was provided to the court by defendants' counsel in a letter dated January 23, 1984.

58. A copy of the Delaware Ordinances was provided to the court by defendants' counsel in a letter dated February 17, 1984.

59. A copy of the letter, dated February 1, 1984, from Charles M. Oberly, III, Attorney General, to Laurie R. Bortz, Esq., was furnished to the court.

**1382**

mine whether probable cause for arrest existed. In any event, it cannot be said that Alderman Barton acted in the clear absence of jurisdiction; rather, at most, there existed doubt as to his jurisdiction.

**60.** Title 21, § 709 of the Delaware Code provides:

§ 709. Motor vehicle fines payable by mail.

(a) *Applicability.* —Any duly constituted peace officer in the State who charges any person with any of the offenses hereinafter designated "motor vehicle offenses subject to voluntary assessment" may, in addition to issuing a summons for any such offenses, provide the offending operator with a voluntary assessment form which, when properly executed by the officer and the offender, allows the offender to dispose of the charge without the necessity of personally appearing in the court to which the summons is returnable. The court to which the summons is returnable shall be determined by § 703 of this title.

(b) *Definitions.* —(1) "Payment" as used in this section shall mean the total amount of the fine and of the costs as herein provided and of the penalty assessment added to the fine pursuant to the Delaware Victim Compensation Law, Chapter 90 of Title 11.

(2) "Voluntary assessment form" as used in this section means the written agreement or document signed by the violator wherein he agrees to pay by mail the fine for the offense described therein together with costs and penalty assessment.

(c) *Places and time of payment.* —Payments made pursuant to this section shall be remitted to the court to which the summons is returnable and shall be disbursed in accordance with § 706 of this title. The payment must be received by the court within 10 days from the date of arrest (excluding Saturday and Sunday) and shall be paid only by check or money order.

(d) *Jurisdiction.* —This section shall apply to any licensed resident of the State and to residents of those jurisdictions with which the State has entered a reciprocal agreement pursuant to Chapter 4 of this title.

(e) *Offenses designated as "motor vehicle offenses subject to voluntary assessment"; exceptions.* —All offenses, as now or hereafter set forth in this title, are hereby designated as motor vehicle offenses subject to voluntary assessment except the following offenses:

[ (1)–(8) inclusive. The speeding charge with which Korotki was charged is not included in this list of eight offenses.]

(f) *Offer and acceptance of voluntary assessment; effect; withdrawal of acceptance; request for hearing.*—(1) At the time of making an arrest for any offense subject to this section, the arresting officer may offer the alleged violator the option of accepting a voluntary assessment. The alleged violator's signature on the voluntary assessment form constitutes an acknowledgment of guilt of the offense stated in the form and an agreement to pay the fine as herein provided, together with costs and penalty assessment, within 10 days from the date of arrest (excluding Saturday and Sunday), during which time payment must be received by the court.

(2) The alleged violator, after signing and receiving the voluntary assessment form, may withdraw his acceptance of the voluntary assessment and request a hearing on the charge stated in such form, provided that the alleged violator, within 10 days from the date of arrest (excluding Saturday and Sunday), personally or in writing notifies the court to which payment of the penalty assessment was to be made that he wishes to withdraw his acceptance of the voluntary assessment and requests a hearing on the charge stated in the voluntary assessment form. If the alleged violator notifies the court of such withdrawal and request for hearing as aforesaid, he shall be prosecuted for the charge stated in the voluntary assessment form as if such form had not been issued.

(g) *Penalty.* —If an alleged violator elects the option of accepting a voluntary assessment in accordance with subsection (f) of this section, the penalty for offenses designated as motor vehicle offenses subject to voluntary assessment shall be the minimum fine for each specific offense charged and fines shall be cumulative if more than 1 offense is charged.

. . . . .

(i) *Agreement to accept voluntary assessment; procedure.* —Whenever a person is arrested for commission of an offense subject to this section and has elected to make payment as herein provided, the arresting officer, using the uniform traffic citation, shall complete the information section and prepare the voluntary assessment form indicating the amount of the fine, have the arrested person sign the voluntary assessment form, give a copy of the citation and form to the arrested person and release him from custody. The arresting officer shall also inform the arrested person of the court to which payment shall be submitted. No officer shall receive or accept custody of a payment. If the person declines to accept the voluntary assessment, the arresting officer shall follow the procedure for arrest as set forth in Chapter 19 of Title 11.

(j) *Payment of fine as complete satisfaction; repeat offenders.* —(1) Payment of the prescribed fine, costs and penalty assessment is a complete satisfaction of the violation, except as provided in paragraph (2) of this subsection, but

Under prevailing case law, the existence of such doubt is insufficient to deprive defendant Barton of judicial immunity. That is true in spite of the provisions of Section 709 of Title 21 of the Laws of Delaware;[60]

which, plaintiff argues, prohibited defendant Barton from issuing a warrant for plaintiff's arrest and required him, instead, to issue to plaintiff a traffic citation to permit plaintiff to go on his way. Thus, plaintiff contends that Section 709, which conforms to the terms of the Compact, but which contains no language limiting the jurisdiction of judicial officers, sufficiently deprived defendant Barton of jurisdiction to issue an arrest warrant so as to bar Barton's assertion of judicial immunity. In support of that contention, plaintiff relies on two cases, *Rankin v. Howard*, 633 F.2d 844, 849 (9th Cir.1980), *cert. denied*, 451 U.S. 939, 101 S.Ct. 2020, 68 L.Ed.2d 326 (1981) and *Schorle v. City of Greenhills*, 524 F.Supp. 821, 828 (S.D.Ohio 1981). Both, however, are distinguishable on their facts. In *Rankin*, plaintiff claimed that the judge conspired, and agreed in advance, to issue a particular ruling, that the judge had actual knowledge that the jurisdictional allegations presented to him were fraudulent, and that Kansas law clearly prohibited the judge's actions. The court in *Rankin* recognized that a judge is liable for "a clearly inordinate exercise of unconferred jurisdiction", 633 F.2d at 849, quoting from *Turner v. Raynes*, 611 F.2d 92, 95 (5th Cir.1980), but did not suggest such liability simply because the judge erred in determining his jurisdictional reach. In *Schorle*, the judge was required to transfer any

case in which the defendant asserted his right to jury trial. The defendant did assert that right; but the trial court, nevertheless, heard the case non-jury. Under those circumstances, said the federal district court, the state trial judge was not immune from a § 1983 attack.

A more recent Ninth Circuit case, *O'Neil v. City of Lake Oswego*, 642 F.2d 367 (9th Cir.1981), has expanded upon the "express deprivation of jurisdiction" exception to judicial immunity and has illustrated its narrow scope. *O'Neil* involved a state statute which expressly required a charging affidavit before jurisdiction would be conferred upon a judge to issue contempt charges against a defendant. Although the judge in *O'Neil* conceded that he had acted without the affidavit, the Ninth Circuit held the judge immune. In so doing, Judge Ferguson drew a distinction between "a rule of law expressly depriving [the court] of jurisdiction" and a case in which the court "does not comply with all the requirements of the statute conferring jurisdiction." *Id.* at 369 (footnote omitted). In so doing, Judge Ferguson wrote (at 369–70):

> In the first [situation] the court usurps authority, while in the latter it discharges, albeit imperfectly, the purpose for which it is constituted.

As to the case at bar, nowhere in § 709 of Title 21 of the Delaware Code is there

---

does not waive any administrative penalty in the nature of points which may be lawfully charged to the violator's driving record by the Department of Public Safety.

(2) In the event that following compliance with the payment provisions of this section, it is determined that within the 2-year period immediately preceding the violation, the violator was convicted of or made a payment pursuant to this section in satisfaction of a violation of the same section of this title, personal appearance before the court to which the summons is returnable shall be required. Notice of the time and place for the required court appearance shall be given to the violator by the court to which the summons would be returnable.

(k) *Removal from applicability of section.* —(1) If a payment due pursuant to this section is not received by the court to which the summons is returnable within 10 days from the date of arrest (excluding Saturday and

Sunday), the violator shall be prosecuted for the offense charged on the voluntary assessment form in a manner as if a voluntary assessment form had not been issued. Upon conviction in such prosecution, the court shall impose penalties as provided by this title or other law relating to motor vehicles for the particular violation charged, and the provisions of this section as to payment of fines under voluntary assessments shall not apply.

(2) In addition to the penalties provided for in paragraph (1) of this subsection, it is a class B misdemeanor, punishable as provided by Title 11, for any person, who has elected to make payment pursuant to this section, to fail to do so within 10 days (excluding Saturday and Sunday) from the date of arrest.

(*l*) *Nonexclusive procedure.* —The procedure prescribed is not exclusive of any other method prescribed by law for the arrest and prosecution of persons violating this title. (60 Del.Laws, c. 509, § 1.)

any language which expressly or even impliedly deprives judges of jurisdiction over the issuance of arrest warrants in traffic cases. Section 709 goes no further than to state that a police officer "may" issue summonses for traffic offenses and offer the alleged violator the option of accepting a voluntary assessment. Moreover, subsection (1) of Title 21, § 709 states that the "procedure prescribed is not exclusive of any other method prescribed by law for the arrest and prosecution of persons violating this Title." Accordingly, section 709 which sets forth principles of law without addressing or, in any way, limiting a judicial officer's jurisdiction, does not constitute an unequivocable deprivation of jurisdiction.

There is also a question as to whether defendant Barton's acts constituted judicial acts, because "[i]t is only for acts performed in his 'judicial' capacity that a judge is absolutely immune." *Stump v. Sparkman,* 435 U.S. at 360, 98 S.Ct. at 1106. "Whether an act by a judge is a 'judicial' one relate[s] to the nature of the act itself, *i.e.* whether it is a function normally performed by a judge, and to the expectations of the parties, *i.e.,* whether they dealt with the judge in his judicial capacity." *Id.* at 362, 98 S.Ct. at 1107. Here, both factors indicate that defendant Barton's act of calling Commissioner Treadwell was a judicial act, as it was preparatory to the issuance of a warrant.

Issuance of a warrant is the type of act which judicial officers are often called upon to perform and for which they have been accorded immunity. In *Stump v. Sparkman,* 435 U.S. at 363 n. 12, 98 S.Ct. at 1108 n. 12, Justice White wrote:

> That there were not two contending litigants did not make Judge Stump's act any less judicial. Courts and judges often do act ex parte. They issue search warrants in this manner, for example, often without any 'case' having been instituted, without any 'case' ever being instituted, and without the issuance of

the warrant being subject to appeal. Yet it would not destroy a judge's immunity if it is alleged and offer of proof is made that in issuing a warrant he acted erroneously and without principle.

While defendant Barton did not actually issue a warrant for plaintiff's arrest, he had the duty, in determining whether to issue a warrant, to determine both the law applicable to plaintiff's alleged misconduct and whether or not probable cause existed. *See, e.g., Scott v. Dixon,* 720 F.2d 1542, at 1546 (11th Cir.1983). Thus, Alderman Barton was acting in accordance with his judicial duties in making the telephone calls he placed. Further, it is to be noted that defendant Goughan dealt with Alderman Barton on a judicial basis. Barton, as a judicial officer, had a right to take what he considered appropriate investigatory steps before taking or declining to take the action Goughan sought. The fact that Barton may have acted out of malice or in furtherance of a conspiracy does not deprive him of judicial immunity. In *Harper v. Merckle,* 638 F.2d 848, 856 n. 9 (5th Cir.), *cert. denied,* 454 U.S. 816, 102 S.Ct. 93, 70 L.Ed.2d 85 (1981), the court observed that even a judge who "is approached *qua* judge by parties to a case ... for the purpose of conspiring to violate § 1983 is properly immune from a damage suit." In *Scott v. Dixon,* 720 F.2d 1542, 1547 (11th Cir.1983), *reh'g denied,* 729 F.2d 1468 (11th Cir.1984), the court held that a state court clerk, who acted in a judicial capacity, was immune to suit even if he conspired with another by issuing a criminal arrest warrant to collect a debt.[61] In sum, defendant Barton's placement of the telephone call to Commissioner Treadwell was a judicial act taken by Alderman Barton to aid him in determining whether or not to issue a warrant of arrest. Accordingly, defendant Barton is entitled to absolute immunity from money damages. Therefore, the jury's punitive damages award against him is hereby stricken.

---

**61.** To the same effect, *see Sparks v. Duval County Ranch Co., Inc.,* 604 F.2d 976, 978 (5th Cir.1979), *aff'd. sub nom.; Dennis v. Sparks,* 449 U.S. 24, 101 S.Ct. 183, 66 L.Ed.2d 185 (1980); and *Danner v. Moore,* 306 F.Supp. 433, 437 (W.D.Pa.1969).

## V. QUALIFIED "GOOD FAITH" IMMUNITY OF DEFENDANTS GOUGHAN AND CARTWRIGHT

■ In post-trial motions, defendants have further argued that defendants Goughan and Cartwright are entitled to qualified good faith immunity under the principles of *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), because they acted without malice. The jury, however, found to the contrary. As to defendant Goughan, the jury concluded that he did not act in good faith in ordering plaintiff to go to the Fenwick Island Town Hall and in all of his subsequent actions.[62] Indeed, the jury did not even believe that defendant Goughan had a reasonable good faith belief that plaintiff was speeding.[63] The jury also found that defendant Goughan acted intentionally, willfully and wantonly to do damage to plaintiff Korotki.[64] Those jury findings are not against the weight of the evidence in this case.

The same is true as to defendant Cartwright. The jury found that he did not act in good faith[65] and that he acted intentionally, willfully and wantonly to do damage to persons such as plaintiff.[66] The jury also determined that defendant Cartwright directly participated in the adoption and enforcement of the policy to violate the Compact.[67] Those findings are not against the weight of the evidence. Accordingly, defendant Goughan's and defendant Cartwright's post-trial motions for relief on grounds of qualified immunity are denied.

## VI. COMPENSATORY DAMAGES

■ The only item of compensatory damages which defendants claim to be excessive is the award of $5,000, representing counsel fees paid to Mr. Wimbrow for his legal services in connection with defending plaintiff Korotki on the speeding and careless driving charges in the Delaware courts. Defendants have contended that, with the exception of two and one-half hours of research relating to Maryland law, Mr. Wimbrow's work was duplicative of the work of other attorneys—work which is the basis of other jury awards in favor of plaintiff and against the Fenwick Island defendants in this case—and that Wimbrow's hourly rate of nearly $200 per hour is exorbitant and was even more so in 1979 when he provided his services to plaintiff Korotki.

During a post-trial hearing held in this case on January 20, 1984, this court indicated that it did not believe Mr. Wimbrow's work was duplicative, that Mr. Fifer was entitled to have Mr. Wimbrow as co-counsel assist him in handling a difficult case, and that plaintiff was entitled to compensatory damages for the total number of hours expended by Mr. Wimbrow in connection with the Delaware traffic case, *i.e.* approximately twenty-five hours.[68] This court did suggest during the January 20, 1984, proceeding that the $200 per hour fee paid to Mr. Wimbrow appeared excessive. While this court is not free to set aside a jury verdict simply because the court would have awarded a different amount of damages than the jury, it has the power and also the duty to cure an excessive verdict either by granting a new trial or by denying a new trial conditioned upon the plaintiff's filing a remittitur of the excessive

---

**62.** Questions 38–40, Special Jury Questions, docket number 95.

**63.** Question 1, *id.*

**64.** Question 55, *id.*

**65.** Question 33, *id.*

**66.** Question 53, *id.*

**67.** Questions 30(b) and (c), *id.*

**68.** There existed some dispute as to the precise number of hours expended by Mr. Wimbrow at the January 20, 1984, hearing. Plaintiff's counsel contended that the figure was between twenty-seven and twenty-nine hours, while defendants' counsel rejected this. The court advised counsel, on the record, at the January 20, 1984, hearing to advise the court of the precise number of hours worked by Mr. Wimbrow. Counsel have not so done, and this court, accordingly, is relying upon the testimony at trial that Mr. Wimbrow devoted at least twenty-five hours to plaintiff's case.

portion of the damages. 11 Wright & Miller, Federal Practice & Procedure § 2815 at 99–100 (1973). Although this court may not deprive the parties to a jury trial under the Seventh Amendment, "a remittitur may be assessed in an amount that will bring the verdict on damages to the maximum amount which the jury could have awarded under the evidence introduced at trial." *Call Carl, Inc. v. BP Oil Corporation,* 403 F.Supp. 568, 578 (D.Md.1975) (Young, J.), *aff'd.* in relevant part, 554 F.2d 623 (4th Cir.1977), *cert. denied,* 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977). *See also* 11 Wright & Miller, Federal Practice & Procedure § 2815 at 104–05 (1973). A remittitur gives the plaintiff a choice. "He can refuse to accept the reduced amount of damages and instead proceed to trial." 11 Wright & Miller, *supra,* at 105 (footnote omitted). Alternatively, if he agrees to the remittitur, no new trial is required.

■ A new trial as to all issues is mandatory only when the excessive verdict results from passion and prejudice on the part of the jury—passion and prejudice which may have affected the jury's findings on all or at least other issues including issues of liability. Such passion and prejudice did not exist in this case. Indeed, there is little or no reason to believe that the jury's determination of the Wimbrow fee, or the jury's answer to any Rule 49(a) questions, was grounded in passion or prejudice.

In *Great Coastal Express, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America,* 511 F.2d 839, 847 (4th Cir.1975), *cert. denied,* 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976), Judge Widener noted that "it may be regarded as settled that if an error at the trial requires a new trial on one issue, but this issue is separate from the other issue in the case and the error did not affect the determination of the other issues, the scope of the new trial may be limited to a single issue," quoting from 11 Wright & Miller, Federal Practice & Procedure, Civil (1973) at 93. *See also Call Carl, Inc. v. BP Oil Corporation, supra* at

578; 6A Moore's Federal Practice, 2d Ed., 1974 ¶ 59.06. Moreover, where, as here, special verdicts were used to determine components of damages, any new trial may usually be limited to consideration of the challenged component. *See Hartke v. McKelway,* 526 F.Supp. 97, 105 (D.D.C. 1981), *aff'd.,* 707 F.2d 1544 (D.C.Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 425, 78 L.Ed.2d 360 (1983), in which the trial court had submitted the case to the jury with a special verdict form which required the jury to separate the damages awarded into various components, such as medical expenses and pain and suffering. In *Hartke,* Judge Oberdorfer concluded that the jury's medical expenses award was excessive and granted defendant's motion for new trial on the single issue of the amount of medical expenses incurred by plaintiff unless plaintiff would agree to the remittitur. Similarly, in *Brink's, Inc. v. City of New York,* 546 F.Supp. 403, 414–15 (S.D.N.Y. 1982), the court ordered a new trial limited solely to the amount of punitive damages, in a case in which the jury had returned special verdicts segregating the damages into punitive and compensatory components. In so doing, Judge Weinfeld stated:

Upon further consideration of the entire record and the component elements which should be taken into account, the motion for a new trial is granted unless the City agrees to a remittitur to reduce the punitive damage verdict to the sum of $1,500,000. If the City does not consent to the remittitur within ten days from the date of this opinion, a new trial is ordered limited solely to the amount of punitive damages. The jury's finding that the City has established its burden of proof on the issue of punitive damages shall remain undisturbed.

546 F.Supp. at 415.

In *Maxey v. Freightliner Corp.,* 727 F.2d 350 (5th Cir.1984), the Fifth Circuit held that if plaintiff refused to accept a remittitur, any new trial should be limited to exemplary damages, and in so doing, rejected defendant's argument that the issue of exemplary damages was so interwoven

with liability for compensatory damages that a new trial as to plaintiff's entire claim was required. In so doing, the Fifth Circuit in a *per curiam opinion* stated that "we find it to be an appropriate exercise of our discretion to specify that any new trial granted should be limited to the issue of the amount of exemplary damages to be awarded." *Id.* at 352. In so doing, the Court quoted as follows from *Hadra v. Herman Blum Consulting Engineers,* 632 F.2d 1242, 1246 (5th Cir.1980), *cert. denied,* 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981): "Where as here, the jury's findings on questions relating to liability were based on sufficient evidence and made in accordance with law, it is proper to order a new trial only as to damages." *Id.*

 In this case, this court concludes that in the context of the trial record, the *maximum* hourly fee the jury could have awarded for legal services performed by Mr. Wimbrow in 1979 and 1980 is $100. Mr. Fifer, a lawyer of comparable—if not greater—experience than Mr. Wimbrow and "lead" counsel in the Delaware proceedings, charged plaintiff $60 per hour for legal services performed during the identical time frame. Similarly, the record indicates that Mr. Malawer, a Maryland attorney who represented plaintiff in one of the lawsuits arising out of the Fenwick Island speeding charge in 1976, charged plaintiff $60 per hour for services performed during 1977–78. As of 1984, plaintiff's fee petition indicates that Mr. Fifer had raised his hourly rate from $60 to $75.[69] In light of that evidence, it may be that $60–70 was the prevailing hourly fee for legal services performed by attorneys in the Delaware-Ocean City, Maryland, area in 1978–79. Yet, this court is charged with determining the maximum—rather than the average—hourly fee that Mr. Wimbrow may charge without the fee being deemed excessive. *See Call Carl v. BP Oil Corporation, supra* at 578; *see also Dick v. Watonwan County,* 562

F.Supp. 1083, 1108 (D.Minn.1983). In view of the complete success achieved by Mr. Wimbrow and Mr. Fifer in representing plaintiff on charges of speeding and careless driving, this court is of the view that $100 per hour is the maximum, non-excessive fee Mr. Wimbrow could have charged plaintiff Korotki for legal services rendered during 1978 and 1979. Accordingly, multiplying $100 by twenty-five hours, this court suggests that a remittitur in the amount of $2,500 be entered, *i.e.* the reduction of the Wimbrow fee as an element of damages suffered by Korotki be reduced to $2,500 from $5,000. Plaintiff may accept that remittitur within 20 days of the date of this Opinion or, by not so accepting such remittitur, in effect opt for a new trial limited solely to the amount of damages recoverable as a result of Mr. Wimbrow's legal services.

## VI. CONCLUSION

This Opinion has addressed and disposed of all issues raised in defendants' post-trial motions, except with regard to Plaintiff's Petition for Attorney's Fees and Costs submitted pursuant to 42 U.S.C. § 1988 to be paid by Fenwick Island as well as other defendants.[70] As to those attorney's fees issues, this Court will file an opinion in connection therewith as soon as possible. As to all other issues, this court is today entering the attached Order consistent with the within Opinion.

---

**69.** Plaintiff's Amended Petition for Attorney's Fees and Costs, docket no. 110, court file.

**70.** *See* p. 1367 n. 2, *supra,* as to attorney's fees which plaintiff asks the Maryland and Delaware defendants to pay.